[No. A101652. First Dist., Div. Two. Dec. 15, 2003.]

FISHERMAN'S WHARF BAY CRUISE CORPORATION, Petitioner, v. THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO, Respondent; BLUE AND GOLD FLEET, INC., Real Party in Interest.

COUNSEL

Legal Strategies Group, Ralph C. Alldredge, Gregory S. Gilchrist and Maureen A. Sheehy for Petitioner.

No appearance for Respondent.

Blecher & Collins, Maxwell M. Blecher, Steven J. Cannata, Nixon Peabody, Ernest N. Reddick, James J. Corbelli and David W. Kesselman for Real Party in Interest.

OPINION

**RUVOLO, J.—**

## I.

## INTRODUCTION

Petitioner Fisherman's Wharf Bay Cruise Corporation, doing business as Red and White Fleet (Red and White), competes against its sole and dominant competitor, real party in interest Blue and Gold Fleet, Inc. and affiliated entities[1] (collectively, Blue & Gold), in providing regularly scheduled sightseeing tours on San Francisco Bay (bay cruises). Red and White filed an antitrust lawsuit against Blue & Gold, alleging six causes of action based on California's Cartwright Act (Bus. & Prof. Code, § 16700 et seq.) and the Unfair Practices Act (Bus. & Prof. Code, § 17200 et seq.[2]) (UPA). The trial court granted Blue & Gold's motion for summary adjudication and dismissed most of these causes of action. Red and White petitioned this court for a writ of mandate seeking to compel the trial court to vacate its summary adjudication order and to enter an order denying the motion for summary adjudication.

We affirm in part and reverse in part. We first conclude that Red and White could predicate its causes of action alleging predatory pricing (§ 17043 of the UPA) and the offering of "secret rebates and privileges" (§ 17045 of the UPA) based on Blue & Gold's below-cost sales to wholesale purchasers of bay cruises, an identifiable segment of its total bay cruise business. In so holding, we reject Blue & Gold's contention that it made no below-cost sales

---

[1] Blue and Gold Fleet, Inc. is named as real party in interest along with Blue and Gold Fleet, L.P., Fleet Holdings, L.P., and Pier 39, L.P.

[2] All further undesignated statutory references are to the Business and Professions Code.

because its bay cruise ticket revenues, taken as a whole, are above its costs. We also reinstate the portion of Red and White's section 17045 cause of action based on its purchase of Alcatraz tickets from Blue & Gold on terms less favorable than those generally extended to other wholesale purchasers of Alcatraz tickets.

Next, we conclude Red and White's cause of action alleging Blue & Gold entered into a "combination to restrain trade/exclusive dealing" (§ 16720 of the Cartwright Act) should not have been dismissed in light of Red and White's proffered evidence that Blue & Gold's implied, as well as written, exclusive dealing arrangements foreclosed Red and White from competing in a substantial share of the relevant market.

Lastly, we affirm the summary adjudication granted on the cause of action for tying under section 16727 of the Cartwright Act because sales of bay cruise and Alcatraz tickets are services and do not fall under the provision of the act prohibiting tying arrangements affecting "products."

## II.

### FACTS AND PROCEDURAL HISTORY

The services at issue in the underlying lawsuit are regularly scheduled sightseeing tours on San Francisco Bay (bay cruise) and ferry trips to Alcatraz Island (Alcatraz concession).

For over a decade, Red and White and Blue & Gold have been the only meaningful competitors for bay cruise customers. There are two primary submarkets that make up the bay cruise market. One portion of the market is sold at retail to tourists and local residents, who generally purchase a bay cruise on a "walk-up," spontaneous basis. The other market segment consists of wholesale group purchasers, who buy large volumes of tickets in advance. Most of the tickets sold as group purchases are used by tour operators and travel agents, who include a bay cruise as part of a larger tourist package.

Red and White entered into the bay cruise business in 1997, when it purchased assets from Crowley Maritime Corp. (Crowley). Blue & Gold had originally agreed to purchase all assets of Crowley's passenger operation, but

the State of California filed an action seeking to halt the sale to Blue & Gold on the ground that it would result in Blue & Gold having a monopoly over the San Francisco bay cruise market. As a result of that action, Crowley and Blue & Gold entered into a settlement agreement and consent decree with the State of California in February 1997 whereby Crowley agreed to sell certain of its assets to a third party other than Blue & Gold.

In mid-1997, Crowley sold some of its assets to Red and White, including those necessary to operate a competitive bay cruise business. Blue & Gold purchased those assets not purchased by Red and White. The Alcatraz concession was assigned to Blue & Gold on June 24, 1997, as part of the Crowley sale. Only Blue & Gold operates the Alcatraz concession pursuant to its exclusive contract with the National Park Service, an agency of the United States government. The Alcatraz concession is Blue & Gold's most important contract, as it grants to Blue & Gold the exclusive right to run passenger-carrying ferryboats from San Francisco to Alcatraz Island and to offer tours of Alcatraz Island. The Alcatraz tour is a unique offering in the San Francisco tourist market and among the city's most popular tourist attractions.

Since 1997, the parties' respective shares of the bay cruise market have remained relatively constant. Red and White, the new entrant operating out of one facility, holds approximately one-third of the market. Blue & Gold, operating with more vessels and out of two facilities, holds the remaining two-thirds of the market. It is undisputed that Red and White has lost money annually from its operations, while Blue & Gold has generated a net profit each year.

The events that triggered the present lawsuit allegedly began as soon as Red and White became a competitor in the bay cruise market in 1997. Red and White alleges that since that time, Blue & Gold has engaged in a concerted effort to drive it out of business by engaging in a number of anticompetitive practices. These acts include Blue & Gold systematically charging below-cost prices to wholesale bay cruise customers and entering into exclusive dealing arrangements, below-cost pricing contracts, and tying arrangements that offered valuable Alcatraz tickets to wholesale customers who refrained from patronizing Red and White. Red and White also alleges Blue & Gold has provided wholesale customers with secret discounts on bay cruises and valuable Alcatraz ticket privileges which were denied to Red and White. According to Red and White, the goal of Blue & Gold's efforts was to eliminate Red and White as a competitor, thereby garnering a monopoly position over both the retail and wholesale bay cruise markets.

As a result of this alleged anticompetitive conduct, Red and White sued Blue & Gold on May 16, 2001, in San Francisco Superior Court. Red and

White asserted six causes of action under California's two antitrust statutes—the Cartwright Act and the UPA. The Cartwright Act targets contracts in restraint of trade and promotes a free market by proscribing trusts. (See *The Cartwright Act—California's Sleeping Beauty* (1949) 2 Stan. L.Rev. 201.) The UPA is aimed at safeguarding the public against monopolies and encouraging competition "by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented." (§ 17001.)

The first cause of action for "illegal tying" predicates liability on section 16727 of the Cartwright Act, and alleges Blue & Gold tied the sale of Alcatraz tickets and privileges, over which it holds a monopoly, to wholesale tour customers' refusal to do business with Red and White.

The second cause of action for "secret rebates and privileges" predicates liability on section 17045 of the UPA, and alleges Blue & Gold gave "secret rebates, refunds, commissions, unearned discounts and/or privileges" in the sale of Alcatraz tickets to competing tour operators, which unlawfully prevented Red and White from competing in the wholesale segment of the bay cruise tour market. This cause of action also alleges that Blue & Gold "granted secret rebates, refunds, commissions, unearned discounts and/or [privileges]" in the sale of bay cruise tickets to wholesale customers.

The third cause of action for "combination to restrain trade/exclusive dealing" was brought under section 16720 of the Cartwright Act. This cause of action alleges that Blue & Gold has entered into "various agreements and arrangements in restraint of trade" with tour operators "including, but not limited to," agreements whereby tour operators "agreed to purchase bay cruise tickets exclusively from Blue [&] Gold in exchange for Blue [&] Gold's agreement to provide them with a preferential allocation of Alcatraz tickets."

The fourth cause of action for "predatory pricing" predicates liability on section 17043 of the UPA. This cause of action alleges that Blue & Gold "has offered for sale and sold bay cruise tickets at prices below its fully allocated costs for providing bay cruises" with the intention of injuring Red and White and ultimately eliminating Red and White as an effective competitor.

The fifth cause of action alleges the common law tort of "interference with prospective economic advantage." Red and White alleges that "[i]n an effort to prevent, disrupt, and destroy" Red and White's relationships with tour operators, Blue & Gold "illegally coerced tour operators into agreeing not to purchase bay cruise tickets from [Red and White] by threatening to cut off the tour operators' access to Alcatraz tickets . . . ."

The sixth cause of action alleges "false advertising" under sections 17200 and 17500 of the UPA. This cause of action alleges Blue & Gold engaged in a number of "unfair and/or fraudulent business practices and/or false advertising" including "falsely advertising that Blue [&] Gold was not only the exclusive provider of Alcatraz tours, but of other bay cruise business as well . . . ."

Blue & Gold filed a summary judgment motion, alternatively seeking summary adjudication as to each cause of action alleged in Red and White's complaint. In an order filed October 31, 2002, the trial court granted the motion in part and denied it in part. The ruling that is pertinent to this writ proceeding came after both parties sought clarification of the court's original ruling.

After a new round of briefing and argument, the court modified its original ruling and issued a new order on January 22, 2003. In its final order, the court granted summary adjudication and dismissed Red and White's first cause of action alleging tying in violation of section 16727; its second cause of action alleging secret discounts and privileges in violation of section 17045; the portion of Red and White's third cause of action based on Blue & Gold's exclusive dealing contracts in violation of section 16720; its fourth cause of action alleging predatory below-cost pricing in violation of section 17043; and the portion of Red and White's sixth cause of action alleging false or misleading advertising in violation of section 17500.[3]

Following the summary adjudication order, the only causes of action left standing were the portion of Red and White's third cause of action alleging tying in violation of section 16720; its fifth cause of action alleging tortious interference with prospective economic advantage; and the portion of Red and White's sixth cause of action alleging unlawful and unfair competition in violation of section 17200.

Red and White then filed this petition for writ of mandate. Blue & Gold, as real party in interest, filed points and authorities in opposition. We issued an order to show cause before this court why a peremptory writ of mandate should not issue and temporarily stayed all proceedings in the superior court.

---

[3] No issue is raised with respect to the court's ruling on the portion of Red and White's sixth cause of action alleging false advertising in violation of section 17500. Therefore, we omit any further discussion of this cause of action from this opinion.

## III.

## DISCUSSION

### A. *Propriety of Pretrial Writ Relief*

An order granting partial summary judgment—or summary adjudication—is not an appealable order. However, under certain circumstances, mandate may be granted to review an order granting summary adjudication. (See *Field Research Corp. v. Superior Court* (1969) 71 Cal.2d 110, 111 [77 Cal.Rptr. 243, 453 P.2d 747]; *Mason v. Superior Court* (1985) 163 Cal.App.3d 989, 994 [210 Cal.Rptr. 63].) There is not yet a final judgment in this case, as there are several theories of liability that have withstood summary adjudication. However, even absent a final judgment, appellate courts may consider interim rulings on petitions for an extraordinary writ. The adequacy of an appellate remedy depends on the circumstances of the case, thereby necessarily vesting a large measure of discretion in the appellate court to grant or deny a writ. (*San Gabriel Tribune v. Superior Court* (1983) 143 Cal.App.3d 762, 770 [192 Cal.Rptr. 415].) Several factors move us to exercise our discretion and consider the merits of the petition at this time. If an erroneous ruling creates a likelihood that two trials will be necessary rather than one, the court will issue a writ of mandate. (See, e.g., *H. D. Arnaiz, Ltd. v. County of San Joaquin* (2002) 96 Cal.App.4th 1357, 1366–1367 [118 Cal.Rptr.2d 71]; *City of Glendale v. Superior Court* (1993) 18 Cal.App.4th 1768, 1776–1777 [23 Cal.Rptr.2d 305]; see *Hampton v. Superior Court* (1952) 38 Cal.2d 652, 657 [242 P.2d 1]; *Bricklayers & Masons Union No. 1 v. Superior Court* (1963) 216 Cal.App.2d 578, 582 [31 Cal.Rptr. 115].) That likelihood exists here, where a pretrial ruling has summarily disposed of a large portion of the case, while several causes of action remain for trial. The summarily adjudicated claims involve close and difficult issues of law. Without intervention by writ relief, the trial on Red and White's claims for tying, tortious interference, and unlawful and unfair competition would go forward while omitting significant legal issues that arise out the same facts, and which quite likely should be tried together. (*North American Chemical Co. v. Superior Court* (1997) 59 Cal.App.4th 764, 773 [69 Cal.Rptr.2d 466].)

Moreover, the issues presented are questions of law, making their immediate resolution on a petition for writ of mandate appropriate. It has been recognized that mandate will lie if the trial court has a clear, present and usually ministerial duty and the petitioner has a clear, present and beneficial right to performance of that duty. However, mandamus may not be invoked to control a trial court's exercise of discretion. (See *Residents for Adequate Water v. Redwood Valley County Water Dist.* (1995) 34 Cal.App.4th 1801,

1806 [41 Cal.Rptr.2d 123]; *San Gabriel Tribune v. Superior Court, supra,* 143 Cal.App.3d at p. 771.) On a motion for summary adjudication, the trial court has no discretion to exercise. If a triable issue of material fact exists as to the challenged causes of action, the motion must be denied. If there is no triable issue of fact, the motion must be granted. (Code Civ. Proc., § 437c, subd. (f)(1).) If the trial court errs, it has made an error of law, which automatically constitutes an abuse of discretion. Under these circumstances, obtaining relief by means of mandate may be proper. (*Whitney's at the Beach v. Superior Court* (1970) 3 Cal.App.3d 258, 265–266 [83 Cal.Rptr. 237].) In summary, if the court permits this case to go to trial based on erroneous rulings of law, substantial trial expenses will be needlessly incurred. Thus, we conclude that this is an appropriate matter to be considered on a petition for writ of mandate.

## B. *Summary Judgment Standard in Antitrust Cases*

Our standard of review is well settled. Under Code of Civil Procedure section 437c, a motion for summary judgment or summary adjudication shall be granted if all the papers submitted show there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. On appeal from an order granting summary adjudication, we exercise an independent review to determine if the defendant moving for summary judgment met its burden of establishing a complete defense or of negating each of the plaintiff's theories and establishing that the action was without merit. (*Creighton v. Regents of University of California* (1997) 58 Cal.App.4th 237, 242 [68 Cal.Rptr.2d 125].)

In so doing, we are not concerned with the findings actually made by the trial court in support of its ruling. Rather, we apply the same three-step analysis required of the trial court ruling on a motion for summary judgment or summary adjudication. First, we identify the issues framed by the pleadings because the court's sole function on a motion for summary judgment is to determine from the submitted evidence whether there is a triable issue as to any material fact. Second, where the defendant is the moving party, we determine whether it has met its burden of proof by producing admissible evidence showing that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action. Finally, if the moving party has met its statutory burden of proof and the summary judgment motion prima facie justifies a judgment, we determine whether the opposing party has met its burden of demonstrating the existence of a triable issue of one or more material facts as to that cause of action or defense thereto. In making this determination, we construe the evidence of the moving party strictly and liberally construe that of the opponent, and any doubts as to the propriety of

granting the motion will be resolved in favor of the party opposing the motion. (Code Civ. Proc., § 437c, subds. (c), (o); *Zavala v. Arce* (1997) 58 Cal.App.4th 915, 925–926 [68 Cal.Rptr.2d 571].)

 In applying this exacting standard of review, we are also mindful that both California and federal decisions urge caution in granting a defendant's motion for summary judgment in an antitrust case. "We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.' " (*Poller v. Columbia Broadcasting* (1962) 368 U.S. 464, 473 [7 L.Ed.2d 458, 82 S.Ct. 486], quoted with approval in *Corwin v. Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 852 [94 Cal.Rptr. 785, 484 P.2d 953]; *People v. McKale* (1979) 25 Cal.3d 626, 635 [159 Cal.Rptr. 811, 602 P.2d 731] [the determination of unfair competition often involves a weighing process that requires a full examination of the relevant facts].) However, caution does not equal prohibition, and summary judgment remains available to the defendants in an antitrust lawsuit in appropriate cases. (*Sherman v. Mertz Enterprises* (1974) 42 Cal.App.3d 769, 775 [117 Cal.Rptr. 188] [" '. . . this rule of caution should not be allowed to sap the summary judgment procedure of its effectiveness . . .' "].)

## C. *Fourth Cause of Action Alleging Below-Cost Pricing in Violation of Section 17043*

Because of its pivotal role to the case, both thematically and factually, we commence with a review of the propriety of granting summary adjudication to Red and White's fourth cause of action alleging that Blue & Gold engaged in predatory below-cost pricing in violation of section 17043. As Blue & Gold acknowledges, the trial court's grant of summary adjudication on this issue essentially removed the "nerve center" of Red and White's case.

Section 17043 of the UPA provides: "It is unlawful for any person engaged in business within this State to sell any article or product at less than the cost thereof to such vendor, or to give away any article or product, for the purpose of injuring competitors or destroying competition." Section 17024 defines "article or product" as including a "service or output of a service trade." Under section 17071, "proof of one or more acts of selling or giving away any article or product below cost or at discriminatory prices, together with proof of the injurious effect of such acts, is presumptive evidence of the purpose or intent to injure competitors or destroy competition." In addition,

the UPA contains a "catchall" in section 17049 that prohibits "any scheme . . . or any device of any nature whereby . . . [a] sale below cost is in substance or fact effected in violation of the spirit and intent of this chapter."[4]

The hallmark of predatory pricing as anticompetitive conduct is found "in cases in which a single firm, having a dominant share of the relevant market, cuts its prices in order to force competitors out of the market, or perhaps to deter potential entrants from coming in. [Citation.]" (*Matsushita Elec. Industrial Co. v. Zenith Radio* (1986) 475 U.S. 574, 584–585, fn. 8 [89 L.Ed.2d 538, 106 S.Ct. 1348].) "A firm which drives out or excludes rivals by selling at unremunerative prices is not competing on the merits, but engaging in behavior that may properly be called predatory." (Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act* (1975) 88 Harv. L.Rev. 697.) Firms engage in such conduct with the intent of " 'foregoing present profits in order to create a market position in which [they] could charge enough to obtain supranormal profits and recoup [their] present losses.'. . ." (*O. Hommel Co. v. Ferro Corp.* (3d Cir. 1981) 659 F.2d 340, 348, quoting *Hanson v. Shell Oil Co.* (9th Cir. 1976) 541 F.2d 1352, 1358.) As noted, the prohibitions in the UPA on below-cost sales " 'are designed to protect . . . [a competitor] whose more powerful neighbor is attempting to drive him out of business.' [Citations.]" (*ABC Internat. Traders, Inc. v. Matsushita Electric Corp.* (1997) 14 Cal.4th 1247, 1261 [61 Cal.Rptr.2d 112, 931 P.2d 290].) Red and White alleged just such an injury.

In its complaint, Red and White claimed that Blue & Gold has practiced predatory price discrimination, by "offer[ing] for sale . . . bay cruise tickets at prices below its fully allocated costs for providing bay cruises." These below-cost bay cruise tickets were sold exclusively in the wholesale segment of the market. Generally speaking, wholesale tickets are purchased directly by tour operators, hotel concierges and travel agents, who purchase and resell those tickets as part of a tour package including other attractions such as Alcatraz, city tours, dinners and various forms of entertainment. It was further alleged that Blue & Gold engaged in such conduct, targeted at the wholesale purchasers of bay cruise tours, with the intent to injure or eliminate competition in the bay cruise market.

■ To satisfy the requirements of section 17043, a plaintiff must allege, in other than conclusionary terms, the defendant's sales price, costs in the product, and cost of doing business. (*G.H.I.I. v. MTS, Inc.* (1983) 147

---

[4] Not directly relevant here, section 17050 describes five specific situations in which a seller's below-cost selling will not violate section 17043, including when a seller is selling goods in connection with discontinuing its business, selling seasonal or perishable goods after the optimal time for their sale, selling damaged goods, selling goods pursuant to a court order, and selling goods at a low price in a good faith effort to meet a competitor's legal price.

Cal.App.3d 256, 275 [195 Cal.Rptr. 211].) In support of its predatory pricing claim, Red and White offered the testimony of its accounting expert, Cliff Kupperberg, who analyzed financial data based on Blue & Gold's production of its financial records showing its costs and how Blue & Gold has allocated them to the different services it sells. In analyzing this data, Mr. Kupperberg computed a fully allocated cost of approximately $8 per bay cruise ticket for each year since 1997, when Red and White began competing. Blue & Gold conceded for purposes of summary judgment that the Kupperberg cost calculation was correct. There was also undisputed evidence that Blue & Gold sold wholesale bay cruise tickets to some tour operators at prices as low as $4 during the relevant time period. The wholesale segment of the market accounts for about 15–18 percent of Blue & Gold's bay cruise revenue.

Red and White claimed that these below-cost sales were designed to force it "to choose between competing at price levels where it would lose money, or conceding the wholesale market for bay cruises to [Blue & Gold]." In short, Red and White contended Blue & Gold was placing itself in a position "to sustain short term reductions in its bay cruise revenues in order to obtain the long term advantages of a monopoly position."

However, while some of Blue & Gold's wholesale tickets were sold below cost, all of Blue & Gold's walk-up or retail tickets were sold substantially above cost. These retail bay cruise tickets are purchased at "walk-up" ticket booths located near Fisherman's Wharf where the bay cruise boats dock. The retail price of bay cruise tickets rose from $16 per person in 1997 to $19 per person in 2001. Walk-up/retail tickets account for about 84 percent of Blue & Gold's bay cruise tour revenue.

Significantly, it is undisputed that Blue & Gold's total bay cruise revenue, when aggregating both retail and wholesale ticket sales, exceeded total bay cruise costs during the time periods covered by this lawsuit. Looking at Blue & Gold's pricing across all of its sales, it was not selling its tickets for bay cruises below its cost.

Blue & Gold claims it was entitled to summary adjudication on the predatory pricing cause of action because Red and White failed to establish that Blue & Gold had sold bay cruise tickets at a price that was below its costs, as required under section 17043. Blue & Gold argues "that if over a reasonable period of time, the totality of revenues derived by Blue & Gold's [b]ay cruise product exceeds its costs of operations, there can be no sales below cost . . . ." Blue & Gold goes on to assert: "It simply does not make economic sense to focus solely on the revenues generated by the small percentage of tickets sold to wholesale tour operators. In assessing whether pricing is anticompetitive, the only thing that matters is how much total

revenue is generated on the average by bay cruise ships, and whether that revenue covers the total costs of operating those ships. So long as total revenues cover total operating costs, the bay cruise ships are profitable and the pricing is not anticompetitive." In practical effect, Blue & Gold argues that in order to determine whether there has been a sale below cost, all revenues from tickets sold to retail and wholesale customers during the relevant period must be averaged, and if that average price is above cost, the price of any single ticket cannot be shown to be a sale below cost under the statute.

In opposition, Red and White argues that Blue & Gold is ignoring the language in the key provision of the statutory scheme. Red and White emphasizes that section 17043, and cases interpreting this section, unequivocally prohibit selling *"any article or product"* below cost. (Italics added.) Therefore, since the undisputed evidence showed that some bay cruise tickets were sold to tour operators at below cost, that should end the matter, and the parties should proceed to trial on the unresolved factual issues, such as the critical issue of whether Blue & Gold acted with the intent of "injuring competitors or destroying competition," which the parties concede is an issue of disputed fact. (§ 17043.)

The trial court originally denied summary adjudication on this cause of action. However, in its final ruling, the court reversed its position and granted summary adjudication, finding there was no triable issue of fact regarding whether Red and White's bay cruise ticket pricing violated section 17043's prohibition against predatory pricing because there had been no sale below cost. In so holding, the court relied exclusively on *International Travel Arrangers, Inc. v. NWA, Inc.* (8th Cir. 1993) 991 F.2d 1389 (*International Travel*).

In *International Travel*, the plaintiff, an independent tour operator, sued an airline and its affiliated air carrier and tour operator for predatory pricing under the federal Sherman Antitrust Act (15 U.S.C. § 1 et seq.) (Sherman Act). The plaintiff sought to create a below-cost pricing claim based upon a segment of the seats sold on commercial airline flights. The court rejected plaintiff's argument that a federal predatory pricing claim can be based on isolating a segment of ticket sales and ignoring the defendant's overall pricing structure. The court stated, "Even if some of Mainline's fares were below cost, International has failed to establish . . . that 'defendants' *overall* price structure was predatory.' [Citation.] To evaluate Mainline's pricing structure fairly, it was necessary to consider not just its lowest prices, but all of its prices for the routes involved, for that is the only basis upon which the relationship between Mainline's charges and costs could be determined." (*International Travel, supra,* 991 F.2d at p. 1396.)

In determining whether sales are made "below cost," the prevailing analysis under federal antitrust law, as illustrated by *International Travel*, is not performed on a product-by-product basis, but across an entire line of products sold by the defendant with a focus on whether or not the below-cost sales pose a genuine threat to the overall competition. In *Morgan v. Ponder* (8th Cir. 1989) 892 F.2d 1355, the court noted: "Courts have been wary of plaintiffs' attempts to prove predatory pricing through evidence of a low price charged for a single product out of many, or to a single customer. [Citations.]" (*Id.* at p. 1362; see also *Directory Sales Mgmt. v. Ohio Bell Telephone Co.* (6th Cir.1987) 833 F.2d 606, 614 [although a telephone company gave away free first listings in its telephone book, they engaged in predatory pricing only if their "overall charges for advertising space in their yellow pages are priced below cost"]; *Bayou Bottling, Inc. v. Dr Pepper Co.* (5th Cir. 1984) 725 F.2d 300, 305 [" '[t]he pricing of one size [of soft drink] at a predatory level would not necessarily drive out rivals who were selling a full line . . .' "]; *Janich Bros., Inc. v. American Distilling Co.* (9th Cir.1977) 570 F.2d 848, 856 ["product" for purposes of predation analysis must be defined "such that if predatorily priced, rivals are likely to be driven out of the market or excluded, allowing the firm to raise prices"]; *Bushnell Corp. v. ITT Corp.* (D.Kan. 1997) 175 F.R.D. 584, 588 [where plaintiff does not indicate that it could allege facts to support a finding of a threat to competition generally, a certain pricing practice with respect to a single product does not violate the antitrust laws]; *Lomar Wholesale Grocery v. Dieter's Gourmet Foods* (8th Cir.1987) 824 F.2d 582, 597–598 [court refused to apply below-cost pricing test to only four of the 180 common items that competing specialty food stores sold].)

But these *federal* authorities relied on heavily by Blue & Gold do not convince us that below-cost pricing for even a limited number of customers, or a market segment, falls outside of the reach of our *state*'s antitrust law simply because the overall enterprise remains profitable. In making its arguments based on federal authority, Blue & Gold fails to acknowledge the significant differences between the language of the Sherman Act, the federal antitrust statute prohibiting predatory below-cost pricing, and its state counterpart, section 17043 of the UPA.

In the Sherman Act, Congress prohibits predatory pricing in 15 U.S.C. section 2, which provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court." Because the Sherman Act provides no clear rules delineating the distinction between

competitive and predatory behavior, courts have developed and applied their own standards. Consequently, the court in *International Travel* did not have to tailor its analysis to the more explicit, and specific, language of section 17043, which makes it unlawful for a business to sell "*any article or product at less than the cost thereof* . . . for the purpose of injuring competitors or destroying competition." (Italics added.)

■ It has been observed that "[t]he UPA, in contrast to the federal antitrust statutes, is precisely drawn to eliminate defined commercial practices such as predatory pricing. Therefore, changing judicial perspectives on antitrust enforcement have far less influence on the development of California predatory pricing law than on the development of the federal counterparts." (McCall, *Private Enforcement of Predatory Price Laws Under the California Unlawful Practices Act and the Federal Antitrust Acts* (1997) 28 Pacific L.J. 311, 315; see also *id.* at pp. 328–329.) This explains why courts in *state* predatory price cases brought under the UPA focus literally on whether the defendant sold "*any article or product*" at less than cost. Under the individual item approach, the invoice cost of a product becomes the benchmark to determine if statutory sales below cost have occurred. (See, e.g., *Wholesale T. Dealers v. National etc. Co.* (1938) 11 Cal.2d 634, 640 [82 P.2d 3] [selling certain products below cost on certain specified days]; *E&H Wholesale, Inc. v. Glaser Bros.* (1984) 158 Cal.App.3d 728, 733–738 [204 Cal.Rptr. 838] [holding that a prima facie case under section 17043 was made out by proof of a sale below cost and a diversion of business to defendant]; *People v. Black's Food Store* (1940) 16 Cal.2d 59, 61–62 [105 P.2d 361] [goods sold below invoice or replacement cost]; *Ellis v. Dallas* (1952) 113 Cal.App.2d 234, 236 [248 P.2d 63] [certain grocery articles sold below cost]; *Garner v. Journeyman Barbers' etc. Union* (1963) 223 Cal.App.2d 101, 107 [35 Cal.Rptr. 693] [haircuts offered with coupon sold at less than cost].) These cases have analyzed the challenged sales based upon the *actual* below-cost prices charged for a product or service, without regard to whether other above-cost sales on identical or similar products made the overall enterprise profitable.

■ Of course, highly competitive pricing is not always predatory, even when the dominant company in the market does it. A firm that cuts its prices or substantially reduces its profit margin is not necessarily engaging in predatory pricing. It may simply be responding to competition or to a downturn in market demand. Our Supreme Court has cautioned: "Pricing practices are not unfair merely because a competitor may not be able to compete against them. Low prices often benefit consumers and may be the very essence of competition. . . . Courts must not prohibit 'vigorous competition' nor 'render illegal any decision by a firm to cut prices in order to increase market share.' " (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 189 [83 Cal.Rptr.2d 548, 973 P.2d 527].)

 Once a below-cost sale is shown, whether the competitor's sale was conducted with the intent of injuring competitors and whether such sales had the tendency or capacity to injure the plaintiff, are usually questions of fact. (*Ellis v. Dallas, supra,* 113 Cal.App.2d at p. 237.) The portion of the statute requiring the act of selling below cost be done with anticompetitive intent is an "integral part of the act prohibited" and it is likely that a statute prohibiting "every sale below cost . . . regardless of intent" would be found to be unconstitutional. (*Wholesale T. Dealers v. National etc. Co., supra,* 11 Cal.2d at p. 658.) The issues of predatory intent and damages are separate inquiries from the threshold question of whether below-cost sales occurred. But the interrelationship of pricing and predatory intent can easily be conflated, resulting in courts confusing the concept of whether the defendant acted with injurious intent, and the concept of whether the defendant engaged in below-cost sales in the first instance.

The case of *Western Union Financial Services, Inc. v. First Data Corp.* (1993) 20 Cal.App.4th 1530 [25 Cal.Rptr.2d 341](*Western Union*), cited by Blue & Gold, provides an illustration of such a case. In *Western Union,* an injunction was sought prohibiting below-cost sales under section 17043. In seeking the injunction, Western Union argued that First Data had engaged in predatory pricing by selling certain money transfer services (money orders) below cost.

Plaintiff Western Union was the nation's largest money transfer business, which for decades was the only company offering money transfer service on a nationwide basis. To maintain its preeminent position, Western Union fielded more than 18,000 agents in the United States. In contrast, defendant First Data was a new entrant in the money transfer business, with 8,000 agents, and less than 10 percent of the money transfer market share. First Data offered three kinds of money transfers: 1) domestic; 2) Mexican; and 3) international. For accounting and management purposes, First Data did not separately account for costs or profitability for each separate type. (*Western Union, supra,* 20 Cal.App.4th at pp. 1532–1533, fn. 2, 1534.)

First Data waged a limited, five-month promotional campaign in the hope of increasing its name recognition and its national market share from 7 to 14 percent. In this campaign, First Data offered domestic money orders of $300 or less for a charge of $9—a charge less than the "cost" (total expenses) for First Data's money orders when domestic money orders were considered separately or in conjunction with all other types. (*Western Union, supra,* 20 Cal.App.4th at pp. 1533–1534.) However, the average price of all of First Data's money orders (domestic, Mexican, and international) taken collectively, were above First Data's costs. (*Id.* at pp. 1534–1535.)

The court rejected Western Union's attempt to enjoin First Data from selling below cost in just one segment of its total money transfer sales (domestic money orders of $300 or less) as part of a short-term promotion. As the court explained, any other interpretation would lead to an "absurd result" where every business's promotional sales "targeting a point of origin or destination or specific days of the week when business is slow" would have to be evaluated as a separate product. (*Western Union, supra,* 20 Cal.App.4th at p. 1538.) The court concluded, "First Data's classification of all money transfers as one product is permissible (it is not unfair, dishonest, deceptive, destructive, fraudulent or discriminatory) and First Data is not required to allocate costs according to some artificial subproduct standard dictated by its competitor." (*Ibid.*) For these reasons, the court concluded there was no sale below cost within the meaning of section 17043. (*Western Union, supra,* at p. 1539, fn. 9.)

The court's broad language must be considered in the context of what it was being asked to do. The court was reviewing Western Union's effort to enjoin First Data's relatively benign short-term use of below-cost sales to improve its weak market position. The court was clearly skeptical of Western Union's argument that this marketing tool was being used with the intent to destroy competition or injure Western Union. The court's skepticism was justified. It has been observed that the device of below-cost sales can "only be effectively used by the large monopolistic-tending seller against a small business which is unable to respond in kind . . . ." (McCarthy, *Whatever Happened to the Small Businessman? The California Unfair Practices Act* (1968) 2 U.S.F. L.Rev. 165, 175.) Given the respective size of the parties and attributes of the money transfer market, predation was not a real possibility in that case. Accordingly, the result in *Western Union* appears to have been focused primarily on the lack of injury and intent.

In contrast to the situation profiled in *Western Union,* we are reviewing a grant of summary adjudication to a claim that Blue & Gold, the dominant force in the market, is systematically selling below-cost tickets in a segment of the bay cruise market that is recognized as being vital to Red and White's ability to survive as an effective competitor. The issue before us is narrow. In order for Red and White's claim of predatory pricing under section 17043 to go forward, it must be legally entitled to rely on the fact that Blue & Gold sold tickets below cost to the wholesale segment of the market, although Blue & Gold's bay cruise business as a whole remained profitable. The issue is resolved by looking to the language of the statute itself. Whatever evidence the parties may be able to garner on intent and injury plays no role here.

An issue of significance in *Western Union* was the factual dispute as to the relevant market for purposes of determining if below-cost sales had been

made. Western Union insisted that First Data's sales for domestic money orders were distinct and separate from its Mexican and international money order business, and therefore, as to the domestic market segment, First Data's money orders were clearly being sold below its cost. First Data, on the other hand, maintained that Western Union was trying to artificially segment its product market in order to demonstrate below-cost sales. (*Western Union, supra,* 20 Cal.App.4th at p. 1534.) Invoking Shakespeare's " 'rose by any other name' theory," the court commented that under the record evidence, and contrary to Western Union's assertion, "a money transfer is a money transfer is a money transfer . . . ." (*Ibid.*) The court explained, " For all accounting and management purposes, First Data . . . does not 'break out' or separately account for costs or profitability from domestic or international transfers, nor does it in the ordinary course of business segregate costs or profitability on the basis of the dollar amount of the money transfer or by state of origin." (*Ibid.*) The court saw no reason to permit Western Union to "define a product line by foisting its own accounting procedures on other companies when they attempt to compete. In short, the fact that Western Union segregates domestic and Mexico and international transfers to determine its own costs and profit does not mean it can compel First Data and all future competitors to do likewise." (*Id.* at p. 1538.)

By contrast, in this case, Blue & Gold has conceded that the wholesale and retail bay cruise markets are separate. It is also undisputed that both the wholesale and retail markets are important to providers of bay cruises. Wholesale business is particularly important during the off-season, since the tour operators continue to provide steady business when the walk-up business drops off. Many of the costs of operating a bay cruise are fixed (vessel financing, fuel, staff, administrative overhead). Having enough passengers, therefore, to cover the fixed costs associated with a bay cruise operation is critical. Consequently, without success in *both* wholesale and retail markets, a provider of bay cruises cannot cover its fixed operating costs and must eventually fail.

Despite these differences, and despite quoting the language of section 17043, we remain puzzled by the failure of the *Western Union* court to analyze either the plain statutory language central to the determination of below-cost sales, or the cases which for decades have implicitly confirmed that the exercise of price averaging does not defeat a claim of predatory pricing under the UPA.[5] To the extent *Western Union* can be read as allowing

---

[5] While the decisions in *People v. Black's Food Store, Garner v. Journeyman Barbers' etc. Union,* and *Ellis v. Dallas,* among others, are cited in the *Western Union* opinion to support the court's cost analysis, what is apparently overlooked is that liability in each case was premised on anticompetitive conduct involving below-cost pricing of only some of the defendants' products.

price averaging for a line of products to defeat categorically a claim of below-cost sales under section 17043 of the UPA, we disagree.

In so holding we are mindful of Blue & Gold's admonition that this conclusion sounds the death knell of the blue plate special, the Saturday matinee, and discounted events for the elderly and children. Such hyperbole[6] ignores the significant evidentiary hurdles Red and White has yet to overcome in order to prove its predatory pricing claim under section 17043.

The record is redolent with triable issues of material fact with respect to whether the necessary elements of a section 17043 claim are present in this case. For example, in order for Red and White to maintain its price predation claim successfully, it must be able to link Blue & Gold's below-cost pricing to a competitive injury. (See *C.E. Services, Inc. v. Control Data Corp.* (5th Cir. 1985) 759 F.2d 1241, 1247 [distinguishing harm to a full-line competitor from harm to competitor dealing primarily in product priced at predatory level].) It must also be able to show that the below-cost sales were done "for the purpose of injuring competitors or destroying competition." These will be formidable tasks. (See *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra,* 20 Cal.4th at pp. 172–175.)

All we decide here is that Red and White has overcome the first evidentiary hurdle and presented proof of below-cost sales by Blue & Gold. We disagree with Blue & Gold's argument that it is entitled to have its wholesale bay cruise ticket pricing averaged with its retail ticket sales in determining if the below-cost pricing requirement of section 17043 is met. Acceptance of this argument would inoculate Blue & Gold against potential liability under section 17043 were it to decide deliberately to price its wholesale bay cruise tickets below cost in order to drive out a new ferry company seeking to compete in only the wholesale market. We are unwilling to allow Blue & Gold, or any other alleged commercial predator, to seek refuge in such a "price averaging" safe harbor.

---

[6] The hyperbole arises not from the characterization of these promotional activities as below-cost sales—for clearly they are—but from the supposition that they evince predatory intent and are actionable. Section 17044 prohibits the use of "loss leaders" to injure competitors. A "loss leader" is defined as any article or product sold "[w]here the effect is to divert trade from or otherwise injure competitors." (§ 17030, subd. (c).) Despite the broad definition of "loss leaders," commercial users of this marketing tool face potential liability only if its use is undertaken with an intent to injure competitors or to destroy competition, and not simply to increase sales. (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra,* 20 Cal.4th at pp. 175–179.)

### D. *Second Cause of Action Alleging Pricing Discrimination in Violation of Section 17045*

Section 17045 of the UPA provides: "The secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition, is unlawful."

"Section 17045 seeks to foster 'fair and honest competition' (§ 17001) by prohibiting certain 'dishonest, deceptive . . . and discriminatory practices' (*Ibid.*), including the secret allowance of an unearned discount where such allowance injures a competitor and tends to destroy competition." (*ABC Internat. Traders, Inc. v. Matsushita Electric Corp.* (1997) 14 Cal.4th 1247, 1256 [61 Cal.Rptr.2d 112, 931 P.2d 290] (*ABC v. Matsushita*).) For example, "where one competitor is given a major pricing advantage over another competitor, such pricing discrimination has an inherent tendency to destroy competition." (*Diesel Electric Sales & Service, Inc. v. Marco Marine San Diego, Inc.* (1993) 16 Cal.App.4th 202, 213–214 [20 Cal.Rptr.2d 62].) Violation requires proof that payments were, in fact, secret and discriminated among customers of the entity granting the rebates. (*Harris v. Capitol Records etc. Corp.* (1966) 64 Cal.2d 454, 463 [50 Cal.Rptr. 539, 413 P.2d 139]; see *Chicago Title Ins. Co. v. Great Western Financial Corp.* (1968) 69 Cal.2d 305, 323 [70 Cal.Rptr. 849, 444 P.2d 481] [complaint must allege that prices differ from customer to customer].)

The second cause of action in Red and White's complaint alleges that Blue & Gold violated section 17045 by engaging in two types of discriminatory conduct. First, Red and White alleged that Blue & Gold used secret, discriminatory terms to obtain the business of wholesale customers in order to encourage them to choose Blue & Gold over Red and White as their vendor for bay cruise tickets. Secondly, Red and White claims that Blue & Gold violated section 17045 by giving secret and discriminatory discounts to other purchasers of Alcatraz tickets, including both the amount of such tickets and the terms of purchase and use, to the injury of Red and White in its status as a competing purchaser of Alcatraz tickets. Importantly, the first prong of this cause of action is based on Red and White's status as a *seller of wholesale bay cruise tickets*, while the second prong is based on Red and White's position as a *buyer of Alcatraz tickets*.

As we have noted, section 17045 prohibits a seller from secretly allowing unearned discounts to a purchaser that injure a competitor and tend to destroy competition. In *ABC v. Matsushita, supra,* 14 Cal.4th 1247, our Supreme

Court considered whether section 17045 was limited in scope to competition between sellers of particular products or services, or whether it includes within its definition competition between buyers. The court expressly held that the type of "competition" protected under section 17045 is *not* restricted to competition between the sellers allowing the unearned discount (or the "primary" line of commerce), but extends as well to competition between the purchasers receiving such discounts (the "secondary" line of commerce). (*ABC v. Matsushita, supra,* at pp. 1254–1268.) In so holding, the court explicitly rejected the "current economic orthodoxy" in favor of its interpretation of the statutory language and its legislative history. (*Id.* at p. 1267.) The Supreme Court concluded that section 17045 "was *intended primarily* to protect against competitive injury in the secondary line of commerce, i.e. at the level of the discount's recipient." (*ABC v. Matsushita, supra,* at pp. 1261–1262, italics added.)

With regard to the first prong (primary line competition), the court granted summary adjudication, finding that this cause of action was actually "predicated on Blue & Gold's potential violation of Bus. & Prof. Code, § 17043's prohibition against predatory pricing. See *Kentmaster Mfg. Co. v. Jarvis Products Corp.* (9th Cir. 1998) 146 F.3d 691, 695." Therefore, because the court found there was insufficient evidence to create a triable issue of material fact regarding Red and White's section 17043 predatory pricing claim, the court also dismissed this portion of Red and White's section 17045 claim as well.

■ We have already concluded that triable issues of material fact exist with regard to Red and White's cause of action for predatory pricing based on section 17043. As Blue & Gold concedes, if a triable issue of fact exists on Red and White's predatory pricing claim, Red and White is entitled to proceed on the merits of the portion of its section 17045 claim involving sales to the wholesale market as well. We agree, and for that reason alone, the court erred in dismissing the first portion of Red and White's section 17045 cause of action.

The second part of this cause of action raises an issue that cannot be resolved so facilely. As to Alcatraz tickets, Red and White claims that other wholesale purchasers of Alcatraz tickets (generally tour operators who offered Alcatraz along with other Bay Area tourist attractions) were offered substantial allocations of tickets on favorable terms that were not extended to Red and White in its purchase of Alcatraz tickets. Specifically, Red and White's complaint alleges harm to competition in the secondary line of commerce and claims that "[d]uring the relevant period, other tour operators who competed with [Red and White] for the provision and purchase of Alcatraz tour tickets were granted secret rebates, refunds, commissions, unearned discounts and/or privileges by Blue & Gold in the sale, allocation and return of these Alcatraz tickets," which were denied to Red and White.

For purposes of summary judgment, Blue & Gold did not dispute any of these factual allegations. Its only defense to this claim was its argument that Red and White could not complain about the number of Alcatraz tickets proffered for sale or the terms under which they were allocated, because of a 15-ticket limit which had been incorporated into a 1997 written contract between Red and White and Blue & Gold.

The 1997 agreement was entered into when Red and White first came into existence and became a direct competitor with Blue & Gold for the bay cruise market. Before their respective business deals with Crowley were finalized, Red and White approached Blue & Gold about purchasing an allocation of Alcatraz tickets. Blue & Gold refused to sell Red and White any Alcatraz tickets, which, as we have already noted, Blue & Gold exclusively controlled through a contract with the National Park Service.[7] Thereafter, the California Attorney General's office facilitated a meeting between the parties.

Pursuant to an agreement negotiated at that meeting, Blue & Gold agreed to sell to Red and White 15 Alcatraz tickets per day. Although Red and White has purchased 15 tickets daily, it has repeatedly requested that its allocation be increased. Blue & Gold has consistently refused. Red and White claims it entered into the 15-ticket agreement because Blue & Gold had previously refused to provide it *any* Alcatraz tickets, and Red and White believed that it was better to have some assurance of at least 15 tickets than to have none.

In granting summary adjudication, the court agreed with Blue & Gold, finding "[t]here is no triable issue of fact regarding whether Blue & Gold violated Bus. & Prof. Code[,] § 17045's prohibition against secret payment or allowance of rebates, refunds, commissions, or unearned discounts." The court essentially concluded that "the 1997 agreement between Blue & Gold and Red [and] White bars" this cause of action.

■ Challenging the court's reliance on this 1997 agreement in granting summary adjudication, Red and White argues that its "agreement to accept [15] Alcatraz tickets shows no acquiescence that other tour operators should receive more tickets on discriminatory and unfair terms." We find this argument persuasive. There is nothing in the 15-ticket agreement that immunizes Blue & Gold from the sting of any antitrust violations that are alleged by Red and White. Red and White's agreement to accept 15 Alcatraz tickets does not evince a concession that other tour operators should receive more tickets on discriminatory and unfair terms. (See *Kolling v. Dow Jones & Co.* (1982) 137 Cal.App.3d 709, 718 [187 Cal.Rptr. 797] [terminable nature

---

[7] When his deposition was taken, Blue & Gold's president, Ron Duckhorn, explained that it refused to sell Alcatraz tickets to Red and White to avoid "[c]onfusing the public."

of newspaper distributorship did not defeat antitrust action against publisher which was, instead, dependent upon evidence of a conspiracy and an anticompetitive purpose and effect behind distributorship termination].) Accordingly, we conclude that both prongs of Red and White's section 17045 claims are properly before the trial court.

### E. *Third Cause of Action Alleging Exclusive Dealing in Violation of Section 16720*

In the third cause of action of Red and White's complaint, it alternatively alleges that Blue & Gold combined to restrain trade by participating in exclusive dealing arrangements, in violation of section 16720 of California's Cartwright Act. The Cartwright Act prohibits every trust, defined as "a combination of capital, skill or acts by two or more persons" for specified anticompetitive purposes. (§ 16720.) Section 16720 generally codifies the common law prohibition against restraint of trade. (*Kolling v. Dow Jones & Co., supra*, 137 Cal.App.3d at p. 717.)

The federal Sherman Act prohibits every "contract, combination . . . or conspiracy, in restraint of trade." (15 U.S.C. § 1.) "The similar language of the two acts reflects their common objective to protect and promote competition. [Citations.] Since the Cartwright Act and the federal Sherman Act share similar language and objectives, California courts often look to federal precedents under the Sherman Act for guidance. [Citation.]" (*Chavez v. Whirlpool Corp.* (2001) 93 Cal.App.4th 363, 369 [113 Cal.Rptr.2d 175]; *Exxon Corp. v. Superior Court* (1997) 51 Cal.App.4th 1672, 1680 [60 Cal.Rptr.2d 195]; *Morrison v. Viacom, Inc.* (1998) 66 Cal.App.4th 534, 541 [78 Cal.Rptr.2d 133] (*Morrison*); *Redwood Theatres, Inc. v. Festival Enterprises, Inc.* (1988) 200 Cal.App.3d 687, 694 [248 Cal.Rptr. 189] (*Redwood Theatres*).)

In framing its cause of action under section 16720, the third cause of action claims that Blue & Gold used its "monopoly control" over the Alcatraz concession to induce tour operators to agree to "purchase bay cruise tickets exclusively from Blue & Gold in exchange for Blue & Gold's agreement to provide them with a preferential allocation of Alcatraz tickets." Red and White alleges that these agreements, which in effect improperly encouraged select tour operators to use Blue & Gold exclusively as its ticketing agent for bay cruises, enabled Blue & Gold to increase its market power and to exercise control over the bay cruise market.

"California and federal antitrust law under the two acts generally distinguish between conduct that is per se unlawful and conduct that is evaluated under the rule of reason. The law conclusively presumes manifestly anticompetitive restraints of trade to be unreasonable and unlawful, and evaluates

other restraints under the rule of reason. [Citations.]" (*Chavez v. Whirlpool Corp., supra,* 93 Cal.App.4th at p. 369.) In California, exclusive dealing arrangements are not deemed illegal per se. "They may provide an incentive for the marketing of new products and a guarantee of quality-control distribution. They are proscribed when it is probable that performance of the contract will foreclose competition in a substantial share of the affected line of commerce. [Citation.]" (*Dayton Time Lock Service, Inc. v. Silent Watchman Corp.* (1975) 52 Cal.App.3d 1, 6 [124 Cal.Rptr. 678].) Consequently, a determination of illegality is tested under a rule of reason and "requires knowledge and analysis of the line of commerce, the market area, and the affected share of the relevant market. [Citation.]" (*Id.* at p. 7.) The resulting factual inquiry often makes summary judgment inappropriate. (*Redwood Theatres, supra,* 200 Cal.App.3d at p. 713; *Corwin v. Los Angeles Newspaper Service Bureau, Inc., supra,* 4 Cal.3d at p. 855 ["Whether a restraint of trade is reasonable is a question of fact to be determined at trial."].)

For purposes of summary judgment, Blue & Gold conceded the existence of exclusive dealing contracts between itself and certain tour operators, but argued that, at best, the alleged exclusive dealing contracts represented less than 3 percent of the bay cruise market—an amount having an insignificant effect on competition.

In so arguing, Blue & Gold invoked a line of cases holding that, even if exclusive dealing can be proved, it will not be actionable under section 16720 unless it forecloses competition in a substantial share of the affected market. (See, e.g., *Exxon Corp. v. Superior Court, supra,* 51 Cal.App.4th at pp. 1680–1681 ["Vertical non-price restraints are tested under the rule of reason; that is, the plaintiff must prove that the restraint had an anticompetitive effect in the relevant market in order to prevail."]; *Roth v. Rhodes* (1994) 25 Cal.App.4th 530, 542 [30 Cal.Rptr.2d 706] [" 'To meet his initial burden in establishing that the practice is an unreasonable restraint of trade, plaintiff must show that the activity is the type that restrains trade and that the restraint is likely to be of significant magnitude.' "].) Therefore, Red and White had to " ' "evince a substantially adverse effect on competition in the relevant market to support a viable legal theory" ' . . . and consequently to survive a summary judgment motion." (*Bert G. Gianelli Distributing Co. v. Beck & Co.* (1985) 172 Cal.App.3d 1020, 1049 [219 Cal.Rptr. 203]; see also *U.S. v. Microsoft Corp.* (D.C. Cir. 2001) 346 U.S. App. D.C. 330 [253 F.3d 34, 69] ["Because an exclusive deal affecting a small fraction of a market clearly cannot have the requisite harmful effect upon competition, the requirement of a significant degree of foreclosure serves a useful screening function."].)

In opposition to summary judgment, Red and White observed that just four of Blue & Gold's written exclusive dealing contracts with tour operators

alone foreclosed as much as 20 percent of the wholesale market for bay cruise tours. More fundamentally, Red and White argued that Blue & Gold had *actually* foreclosed as much as *two-thirds* of the wholesale ticket market through a combination of these written exclusive dealing contracts and exclusive dealing arrangements implied through its other unlawful practices (illegal tie-ins and unfair pricing discrimination).

The court granted summary adjudication as to the third cause of action. In doing so, the court found: "In the case at bar, construed in the light most favorable to Red & White, Blue & Gold's exclusive dealing arrangements foreclose 20 percent of the bay cruise market sold through wholesale distributors." The court also stated, "Federal cases have generally held that exclusive dealing restraints operating at the distributor level rather than the consumer level require a higher standard of substantial foreclosure."

The court dismissed Red & White's argument that it had offered proof that Blue & Gold had actually foreclosed more than two-thirds of the wholesale bay cruise market in the following passage: "In its motion for clarification, Red & White argues that Blue & Gold has actually foreclosed more . . . than two-thirds of the wholesale bay cruise ticket sales through an 'overall pattern of illegal, anti-competitive conduct.' Red & White's Bus. & Prof. Code 16720 exclusive dealing claim, however, is an independent cause of action. It must stand, if at all, on its own two feet. As such the Court rejects Red & White's 'monopoly broth' theory as a matter of law."

■ Thus, the trial court's ruling necessarily found as a matter of law that written exclusive dealing contracts precluding a competitor from 20 percent of a relevant market per se had an insubstantial effect on competition under section 16720. While we agree that some de minimus level of foreclosure is certainly insufficient as a matter of law to sustain a claim under section 16720, we do not agree that the competitive impact of foreclosing 20 percent of a market always fails this test of substantiality.

First, we note that courts and commentators have not settled on a minimum percentage as constituting significant foreclosure. (See *Bepco, Inc. v. Allied-Signal, Inc.* (M.D.N.C. 2000) 106 F.Supp.2d 814, 827–828, fn. 14; 11 Areeda & Hovenkamp, Antitrust Law (1998 ed.) ¶ 1821c, pp. 159–165 [setting 20 percent as floor for significant foreclosure and identifying 50 percent as level at which courts "routinely condemn" foreclosure].) Furthermore, in assessing whether a 20-percent market foreclosure is substantial for purposes of the statute, courts must consider any other existing unique market factors which bear on the degree of residual competition between the parties remaining after the exclusive arrangements. (See, e.g., *Tampa Electric Co. v. Nashville Co.* (1961) 365 U.S. 320, 332–335 [5 L.Ed.2d 580, 81 S.Ct. 623]

[weighing a range of factors to determine foreclosure in a competitive coal market under the Clayton Act]; Lockhart & Sacks, *The Relevance of Economic Factors in Determining Whether Exclusive Arrangements Violate Section 3 of the Clayton Act* (1952) 65 Harv. L.Rev. 913.)

In *Redwood Theatres* the plaintiff, a film exhibitor, sued two film distributors, alleging that exclusive contracts between the defendant distributors and competing exhibitors substantially foreclosed plaintiff from its relevant market, in violation of section 16720. The defendant film distributors' market shares were only 16 percent and 15 percent respectively, which "fail[ed] conspicuously to pass the threshold test establishing the defendant's market power." (*Redwood Theatres, supra,* 200 Cal.App.3d at p. 704.) Nevertheless, the court rejected the defendants' argument that based on these raw percentages alone, there was "no need to enter into any further analysis of the competitive impact of the alleged exclusive dealing agreements" to determine if substantial market foreclosure resulted. (*Id.* at p. 705.) Instead, the court engaged in a wide-ranging inquiry into the structure of the relevant market in finding a motion picture exhibitor had presented a triable issue of fact on its claim under section 16720.

The record revealed that, while the defendant distributors had a small share of the film market, they had a large share of popular "first run" films which the court believed "put an entirely different complexion on the issue of market power." (*Redwood Theatres, supra,* 200 Cal.App.3d at p. 707.) The court concluded that because of unusual competitive conditions in the film industry, a film exhibitor who lacked access to a substantial share of popular first-run films may be placed at a grave competitive disadvantage against a competitor who had locked-in access to such films through exclusive dealing arrangements. (*Ibid.*) The *Redwood Theatres* court was also concerned that these exclusive dealing arrangements placed so much of an available market for first-run films in the hands of a small group of dominant distributors, that it made it difficult for exhibitors who were not favored with exclusive contracts to continue to compete effectively, or even to exist, in the relevant market. (*Ibid.*) Thus, in reversing summary judgment, the court eschewed applying a rigid mathematical formula based on the percentage of market foreclosure to determine if an unreasonable restraint of trade under the Cartwright Act had been shown. (*Id.* at p. 713.)[8]

---

[8] Another court has noted that relevant factors to this analysis may also include "the relative strength of the parties[,] the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area[,] and . . . the probable immediate and future effects which preemption of that share of the market might have on effective competition therein." (*Curly's Dairy, Inc. v. Dairy Cooperative Association* (D. Or. 1962) 202 F.Supp. 481, 485, italics omitted.)

In this case, as in *Redwood Theatres*, the record discloses important factors bearing on whether the wholesale bay cruise exclusive arrangements at issue substantially foreclosed competition in the relevant market, beyond simply the raw percentage of market foreclosure encompassed by the written contracts. Blue & Gold is a profitable enterprise occupying a position of dominance in the bay cruise market by controlling two-thirds of the market, while at the same time it enjoys a monopoly over the lucrative Alcatraz concession. Red and White, running at a loss, holds the remaining one-third. Compounding its predominant market position, Blue & Gold's alleged use of its elite Alcatraz concession as leverage to gain exclusive wholesale bay cruise business gave it the necessary market power to endanger Red and White's competition by inhibiting the free choice of even 20 percent of tour operators seeking wholesale bay cruises through written agreements.

Furthermore, the exclusive dealing agreements at issue foreclosed Red and White from a segment of the bay cruise market that plays a crucial role in its economic viability. As already noted, there is intense rivalry for the wholesale bay cruise business because during the off-season, tour operators continue to provide a flow of steady business once the walk-up retail business has dropped off. Consequently, without success in both wholesale and retail markets, a provider of bay cruises cannot cover its fixed operating costs and will eventually fail. These considerations, coupled with other factors present on this record, would permit a trier of fact to find a combination in unreasonable restraint of trade in violation of section 16720.

Perhaps more importantly, we note the trial court's ruling focused solely on the fixed percentage of the market locked up through *written* exclusive dealing agreements, and failed to acknowledge a substantial body of federal authority (which the court expressly deemed controlling on the question), indicating that the existence of an exclusive dealing arrangement may be expressed or implied. (*Standard Co. v. Magrane-Houston Co.* (1922) 258 U.S. 346, 356–357 [66 L.Ed. 653, 42 S.Ct. 360]; *United Shoe Mach. Co. v. United States* (1922) 258 U.S. 451, 457 [66 L.Ed. 708, 42 S.Ct. 363].) Courts have implied an agreement to exclusively deal whenever a seller has used any coercive method that causes buyers to purchase its products exclusively. (See, e.g., *Osborn v. Sinclair Refining Co.* (4th Cir. 1960) 286 F.2d 832, 837; *Tire Sales Corp. v. Cities Service Oil Co.* (7th Cir. 1980) 637 F.2d 467, 474 ["well settled . . . that agreements, arrangements or conditions that unreasonably restrain trade by boycotts or tie-ins may be inferred from the circumstances surrounding a course of dealing"]; *LePage's Inc. v. 3M* (3rd Cir. 2003) 324 F.3d 141, 157 [considering as exclusive dealing "arrangements which, albeit not expressly exclusive, effectively foreclosed the business of competitors"].)

Indeed, one of the leading antitrust treatises recognizes that a contract or arrangement may have the practical effect of exclusivity, even though not

denominated exclusive: "[A]ntitrust policy should not differentiate between the manufacturer of widgets who explicitly imposes exclusive dealing on its dealers and the manufacturer who gives such dealers a discount or rebate for dealing exclusively in the manufacturer's widgets." (Areeda & Hovenkamp, Antitrust Law (2002 supp.) P 18.03b.)

In summary, we conclude that market foreclosure from 20 percent of the relevant market resulting only from written exclusive dealing contracts, under the facts of this case, was substantial enough to require denial of Blue & Gold's motion as to the third cause of action. Furthermore, in considering Red and White's proof in the most favorable light, the court also had before it the full panoply of Blue & Gold's alleged exclusionary conduct, including both written exclusive dealing arrangements, tying agreements and below-cost pricing claims. When Blue & Gold's exclusive dealing contracts are viewed in context with its other alleged anticompetitive behavior, a triable issue of fact exists whether the market foreclosure reached as much as two-thirds of the wholesale bay cruise tour market. As the party opposing summary adjudication, Red and White is entitled to the benefit of all reasonable inferences from this evidence, which precludes the grant of summary adjudication on this cause of action. (Code Civ. Proc., § 437c, subd. (c).)

### F. *First Cause of Action Alleging Tying in Violation of Section 16727*

Finally, Red and White's complaint also alleges illegal tie-ins between the sale of Alcatraz tickets and bay cruise tickets. Tying is " 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier. . . .' [Citations.]" (*Suburban Mobile Homes, Inc. v. AMFAC Communities, Inc.* (1980) 101 Cal.App.3d 532, 542 [161 Cal.Rptr. 811] (*Suburban Mobile Homes.*) Traditionally, the product that is the inducement for the arrangement is called the "tying product," and the product that the buyer is required to purchase is called the "tied product." (*Morrison, supra,* 66 Cal.App.4th at pp. 540–541.) Section 16727 specifically prohibits exclusive dealing and tying arrangements that " 'substantially lessen competition or tend to create a monopoly.' " (*Morrison, supra,* at p. 541; *Suburban Mobile Homes, supra,* 101 Cal.App.3d at p. 539.)[9]

---

[9] A tying arrangement may be condemned also under section 16720, as an unreasonable restraint of trade. However, a plaintiff's proof is more exacting to establish a violation under section 16720. (*Suburban Mobile Homes, supra,* 101 Cal.App.3d at p. 549.) The distinction between the proof required under the two sections is that under "section 16727 the plaintiff must establish . . . *either* the seller enjoys sufficient economic power in the tying product to appreciably restrain competition in the tied product *or* if a not insubstantial volume of

Red and White's complaint alleges that "[s]ince 1997, Blue [&] Gold has tied, both directly and indirectly, the sale and allocation of highly desirable Alcatraz tickets over which it holds a monopoly to wholesale tour operators' agreement to purchase bay cruise tickets exclusively from Blue [&] Gold. As a result, tour operators, who would have otherwise purchased bay cruise tickets from plaintiff [Red and White] have refused to deal with plaintiff, either pursuant to express agreement or out of fear that their allocation of Alcatraz tickets by Blue [&] Gold would be lost or restricted."

The court granted Blue & Gold summary adjudication on its tying claim under section 16727, concluding, "[a]s a matter of law, the Court finds that Bus. & Prof. Code[,] § 16727's provision prohibiting tying and exclusive dealing arrangements in sale or lease of 'goods, merchandise, machinery, supplies, [and] commodities' does not apply to services, such as the sale of Alcatraz and bay cruise tickets."

Section 16727 reads: "It shall be unlawful for any person to lease or make a sale or contract for the sale of *goods, merchandise, machinery, supplies, commodities* for use within the State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State." (Italics added.)

The term "services" in section 16727 is used to describe tied items and is not used to describe tying items. The pivotal question is whether the tying item here—Alcatraz tickets—falls within the definition "goods, merchandise, machinery, supplies [or] commodities."

At oral argument Red and White made several broad, conclusory statements regarding this claim, including that a ticket itself should be considered a commodity. We considered a similar argument in *Morrison, supra,* 66 Cal.App.4th 534. In *Morrison,* plaintiffs brought suit arguing that the cable operator's requirement that a customer purchase broadcast channels in order to purchase satellite cable channels was an illegal tying arrangement and violated section 16727. (*Morrison, supra,* at p. 546.) This court concluded that plaintiffs

commerce in the tied product is restrained. Under [the] section 16720 standard, both conditions must be met. [Citation.]" (*Ibid.*) This alleged tying is also the basis for part of Red and White's section 16720 claim in its third cause of action. The court denied Blue & Gold summary adjudication as to Red and White's tying claim based on section 16720, a ruling that is not at issue here.

failed to state a cause of action under section 16727 because the alleged tying product, cable television, was a service and "section 16727 does not apply when the tying product is a service." (*Morrison, supra,* at p. 548.) In doing so, we noted that section 16727 was essentially adapted from section 3 of the federal Clayton Act, and "section 16727's definition of commodity, like the definition applicable to the Clayton Act, does not include land *services* or credit . . . ." (*Morrison, supra,* at p. 547.) In rejecting plaintiffs' characterization of "cable television as a commodity rather than a service" (*Ibid.*), we looked to "applicable federal authority construing the parallel provision of Clayton Act section 3" and found federal cases directly on point, establishing that cable television is a service and not a commodity. (*Ibid.*)

In assessing whether the Alcatraz tickets at issue here are commodities, we are guided by the court's decision in *Kennedy Theater Ticket Service v. Ticketron, Inc.* (E.D.Pa. 1972) 342 F.Supp. 922 (*Ticketron*), which illustrates that the incidental use of tangible materials, such as a ticket, does not transform a service into a commodity. In *Ticketron*, plaintiff alleged that an admission ticket to an entertainment event was a tangible commodity. The court rejected this claim, concluding that "the dominant purpose of the transaction is not merely the purchase of the tangible admission ticket, but rather the contractual right to occupy a seat at an entertainment attraction. The ticket itself is merely incidental to the transaction, representing a tangible memorandum of the contract. We, therefore, conclude that since the intangible aspects of the admission tickets are dominant over the tangible aspects thereof, an admission ticket does not constitute a 'commodity' within the meaning of the [Clayton] Act." (*Id.* at p. 927, fn. omitted; see also 45 Duke L.J. 1009, 1047 (1996) Note, *Beyond Economic Theory: A Model For Analyzing The Antitrust Implications of Exclusive Dealing Arrangements.*)

We are also guided by the perceptions of *,Tri-State Broadcasting Co. v. United Press Internat'l, Inc.* (5th Cir. 1966) 369 F.2d 268: "Virtually no transfer of an intangible in the nature of a service, right, or privilege can be accomplished without the incidental involvement of tangibles, and we conclude that in such circumstances the dominant nature of the transaction must control in determining whether it falls within the provisions of the Act." (*Id.* at p. 270, fn. omitted.)

Applying *Morrison* to this case, and in accordance with the reasoning in *Ticketron*, we conclude that a ticket entitling a passenger to a seat on a boat to Alcatraz does not constitute a commodity within the meaning of section 16727. Here, as in *Ticketron*, the defendants are in the business of providing a service. The customer contracts for this intangible service—the trip to Alcatraz—not for the tangible ticket required to receive the service. In other words, the ticket itself is merely incidental to providing the service.

Accordingly, Blue & Gold's motion for summary adjudication with respect to the section 16727 tying claim was properly granted.

## IV.

## CONCLUSION

Let a peremptory writ of mandate issue directing the San Francisco Superior Court to vacate its January 22, 2003 order granting Blue & Gold summary adjudication on the second cause of action (secret discounts), the third cause of action (exclusive dealing) and the fourth cause of action (predatory pricing), and to enter a new order, in accordance with the views expressed in this opinion, denying Blue & Gold's motion for summary adjudication on these causes of action. The cause is remanded to the trial court for further proceedings consistent with this opinion.[10]

Kline, P. J., and Lambden, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied April 14, 2004.

---

[10] In view of this conclusion, we need not address Red and White's claims alleging numerous irregularities in the procedure used by the trial court in making its final ruling on summary adjudication. We do not anticipate that these issues will reoccur upon remand.