Filed 1/27/23 Certified for Publication 2/7/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ABRAHAM DEGALA,<br><br>    Plaintiff and Appellant,<br>v.<br><br>JOHN STEWART COMPANY et al.,<br><br>    Defendants and Respondents. | A163130<br><br>(San Francisco County<br>Super. Ct. No. CGC18569661) |

Abraham Degala was attacked and seriously injured by unknown assailants while he was working at a construction site at the Hunters Point East-West housing complex in San Francisco. Degala, who was employed as a foreman by a subcontractor at the site, sued the general contractor and the owner of the site for damages, alleging that they breached their duty to take reasonable security precautions at the site, which was located in a high-crime area.

Defendants moved for summary judgment on the ground that Degala's claims were barred by the *Privette* doctrine (as set forth in *Privette v. Superior Court* (1993) 5 Cal.4th 689 and subsequent cases), under which the hirer of an independent contractor is not liable for on-the-job injuries sustained by the contractor's employees unless some exception applies. The trial court granted summary judgment, rejecting Degala's argument that defendants could be liable to him under the *Hooker* exception to the *Privette*

1

doctrine announced in *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198, 201-202 (*Hooker*) which applies when the hirer retains control over any part of the contractor's work and exercises that control in a way that affirmatively contributes to the plaintiff's injury.

Because we conclude there are triable issues of fact as to whether the site owner and general contractor are liable to Degala under a retained control theory, we shall reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

The Hunters Point East-West construction project involved the rehabilitation of 27 buildings containing residential units. John Stewart Company (JSC) was the general partner of the limited partnership that owned the property, and as such signed the contract hiring Cahill Contractors, Inc. (Cahill) as the general contractor on the project. Cahill in turn hired Janus Corporation (Janus) as a subcontractor to perform demolition work at the site. Abraham Degala was an employee of Janus, and one of its foremen. The project site was located in an area known to have a high rate of crime.

The contract between JSC and Cahill required Cahill to "take reasonable precautions for the safety of, and . . . provide reasonable protection to prevent damage, injury or loss to . . . employees on the work and other persons who may be affected thereby." The subcontract between Cahill and Janus provided that Janus's scope of work *excluded* "[s]ite security," and that Janus was "responsible for securing [its] own tools and equipment." In part of the subcontract entitled "Environmental, Health & Safety (EHS) Requirements," Janus agreed to comply with all applicable EHS rules, regulations, policies, procedures and guidelines when performing work on the site, and to identify a person "knowledgeable" in those rules and guidelines

who would "have the authority to mitigate hazards relative to [Janus's] operations." But the EHS requirements make no mention of physical site security.

The rehabilitation project began in late 2015, and was done in five phases. Degala was attacked in January 2017, at the beginning of phase three of the project.

JSC and Cahill jointly made decisions as to the appropriate amount of site security. JSC and Cahill had weekly discussions about site security because of ongoing concerns about the safety of property and people at the site. During phase one of the project, Cahill hired a company to provide two uniformed security guards at the site during the day to discourage theft. But their services were discontinued in June 2016, when the site owners hired an outside company to provide a video voice system. That system included cameras that were monitored offsite and the capability of communicating with people at the project site if motion sensors were activated. The cameras, however, were not monitored during working hours.

Cahill erected fencing around the areas where work was being performed to keep non-construction workers out of the job site during the day and to secure the site during non-working hours. The fencing was provided for the security of property, tools, and personnel.

In the months and weeks leading up to the January 2017 attack on Degala, Cahill changed security measures from time to time, including closing the project site, in part as an apparent response to incidents in the neighborhood. In August 2016, Cahill stopped weekday overtime work at part of the project because of concerns about worker safety arising from neighborhood tensions. In mid-November 2016, after a shooting in the neighborhood, Cahill instructed workers to stop work before sundown. Later

3

that month, after another shooting, Cahill instructed workers to stay indoors as much as possible while working and to eat lunch and take breaks inside. Cahill closed the project site as a result of concerns over worker safety from 1 p.m. on November 30 through December 1, and on December 13. On December 29, about two weeks before Degala was attacked, Cahill closed the project site early after a shooting in the neighborhood during work hours.

Also on December 29, an electrician working at the site submitted a job hazard analysis form to Cahill stating that "working in the neighborhood" was a hazard. On December 30, Degala submitted a job hazard analysis form to Cahill identifying "Neighborhood shooting guns" as a hazard and suggesting "Police officer on site escort."

Degala was attacked on January 11, 2017, on a day when he was leading a crew that was performing work in two buildings that were separated by a walking path connecting a sidewalk on one street to a sidewalk on a parallel street. Each of the buildings where Degala was working was surrounded by a fence, but there was an unfenced walkway between the buildings, which was used by neighborhood residents. Ordinarily, it was Cahill's practice to fence off an entire area under construction, rather than allowing non-construction personnel to walk between two buildings where construction activity was taking place. In fact, Cahill had originally erected a single fence around the area that included the two buildings where Degala was working the day of the attack. But in response to concerns expressed by residents that the fences blocked a walkway they regularly used as a route to a bus stop, Cahill changed course and had a separate fence constructed around each building, leaving the walkway open to the public so that neighborhood residents would not have to take a less convenient route.

4

The physical attack on Degala took place on the walkway between the two buildings, which was outside the fence line of the construction site. Degala was working in one of the buildings when he was approached by three men, who had somehow come through the fencing that surrounded the building.[1]  They followed him out of the building to the walkway, where they attacked him.  The assailants fled and were never identified.  As an employee of Janus, Degala was covered by workers compensation insurance for his injuries.

Degala sued JSC and Cahill, seeking damages on the basis of negligence and premises liability.  As to negligence, Degala alleged that JSC and Cahill negligently managed the operation of the project site by failing to monitor access to the site and failing to prevent access by people who sought to harm workers.  As to premises liability, Degala alleged that JSC and Cahill had the duty to control and maintain the project site in a reasonably safe condition, and to exercise reasonable care in performing their voluntary undertakings to provide security on the site, which included monitoring safe and secure access to the site.  Degala alleged that JSC and Cahill breached their duties by removing security guards from the project site and allowing "unfettered access" to the site without regard to worker safety.

JSC and Cahill filed separate motions for summary judgment.  The trial court granted the motions and judgments were entered for defendants.  Degala's motions for new trial were denied, and Degala timely appealed.

---

[1] Apparently, there were open or unlocked gates or panels in the fencing that separated the buildings from the walkway.

# DISCUSSION

## A.    *The Privette Doctrine*

Because Degala, as an injured employee of a contractor (Janus), sued the hirer of the contractor (Cahill) and the landowner (JSC) in tort to recover for his injuries, this case implicates the *Privette* doctrine, a long-standing common law principle that a hirer or landowner is ordinarily not liable for injuries to contract workers.[2] (*Sandoval v. Qualcomm Inc.* (2021) 12 Cal.5th 256, 269-270 (*Sandoval*).)  As our Supreme Court reaffirmed in *Sandoval*, the hirer of an independent contractor "presumptively delegates to the contractor the responsibility to do the work safely." (*Id.* at p. 269.)  "A presumptive delegation of tort duties occurs when the hirer turns over control of the worksite to the contractor so that the contractor can perform the contracted work.  Our premise is ordinarily that when the hirer delegates control, the hirer simultaneously delegates all tort duties the hirer might otherwise owe the contract workers." (*Id.* at p. 271.)

Our Supreme Court has recognized exceptions to the *Privette* doctrine, which "apply where delegation is either *ineffective* or *incomplete*." (*Sandoval, supra*, 12 Cal.5th at p. 271, italics added.)  At issue in this case is the exception for *incomplete* delegation, recognized in *Hooker*.  "[W]hen the hirer does not fully delegate the task of providing a safe working environment, but in some manner actively participates in how the job is done, and that participation affirmatively contributes to the [contractor's] employee's injury, the hirer may be liable in tort to the [contractor's] employee." (*Kinsman v.*

---

[2] In analyzing the application of the *Privette* doctrine, we do not recognize any "legal distinction between a general contractor and a landowner who hires independent contractors; both are 'hirers' within the meaning of the doctrine." (*Michael v. Denbeste Transportation, Inc.* (2006) 137 Cal.App.4th 1082, 1097.)

6

*Unocal Corp.* (2005) 37 Cal.4th 659, 671 (*Kinsman*) [discussing *Hooker*, *supra*].)[3]  Accordingly, "[i]f a hirer entrusts work to an independent contractor, but *retains* control over safety conditions at a jobsite and then negligently exercises that control in a manner that affirmatively contributes to an employee's injuries, the hirer is liable for those injuries, based on its own negligent exercise of that retained control."  (*Tverberg v. Fillner Construction, Inc.* (2012) 202 Cal.App.4th 1439, 1446 (*Tverberg*).)

B.     *Standard of Review*

A trial court properly grants a motion for summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)  "We review a grant of summary judgment de novo; we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law." (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.)

A defendant "moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that [the defendant] is entitled to judgment as a matter of law."  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).)  A defendant can meet this burden by showing "that there is a complete defense to [a] cause of action."  (Code Civ. Proc., § 437c, subd. (p)(2).)  A defendant's initial burden in moving for summary judgment is to come forward with evidence to make a

---

[3] Delegation is *ineffective* in the context of a concealed hazard, as recognized in *Kinsman*, which held that a hirer "cannot effectively delegate to the contractor responsibility for the safety of its employees if it fails to disclose critical information needed to fulfill that responsibility, and therefore the [hirer] would be liable to the contractor's employee if the employee's injury is attributable to an undisclosed hazard."  (*Kinsman*, *supra*, 37 Cal.4th at p. 674.)  The *Kinsman* exception is not at issue in this case.

7

prima facie showing that there is no triable issue of material fact (*Aguilar*, *supra*, 25 Cal.4th at p. 850), where the material facts are determined by the pleadings.  (*Fisherman's Wharf Bay Cruise Corp. v. Superior Court* (2003) 114 Cal.App.4th 309, 320.)  If the defendant meets that burden of production, the burden of production shifts to the plaintiff to make a showing that there is a triable issue of material fact.  (*Aguilar*, *supra*, 25 Cal.4th at p. 850.)

In the context of summary judgment, the *Privette* doctrine gives rise to a rebuttable presumption that affects the burden of producing evidence. (*Alvarez v. Seaside Transportation Services LLC* (2017) 13 Cal.App.5th 635, 642-643 (*Alvarez*).)  If the moving party establishes that it hired an independent contractor to perform certain work, and that the plaintiff is an employee of the contractor who was injured in the course of the work, the burden shifts to the opposing party to come forward with evidence raising a triable issue of fact as to whether an exception to the *Privette* doctrine applies.  (*Id.* at p. 644.)  "A party cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact."  (*LaChapelle v. Toyota Motor Credit Corp.* (2002) 102 Cal.App.4th 977, 981.)  Nevertheless, the burden of persuasion remains with the party moving for summary judgment.  (*Aguilar*, *supra*, 25 Cal.4th at pp. 850-851.)  We view the evidence in the light most favorable to plaintiff, as the nonmoving party, "liberally construing [his] evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor."  (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)

C.      *Defendants' Burden*

Each of the defendants in this case met its initial burden to show that it is presumptively entitled to the benefit of the *Privette* doctrine. Degala alleges in his complaint that he was injured while working as a foreman for Janus on the Hunters Point East-West construction site. It is undisputed that JSC was the general partner of the owner of the property; that as the general partner JSC signed the contract hiring Cahill as general contractor on the construction project; and that Cahill hired Janus as a demolition subcontractor on the project. That is all that is required for JSC and Cahill to shift the burden of production to Degala to come forward with evidence raising a triable issue of fact as to the applicability of an exception to the *Privette* doctrine.[4] (*Alvarez, supra*, 13 Cal.App.5th at p. 644.)

D.      *The Retained Control Exception to the Privette Doctrine*

Degala contends that JSC and Cahill retained control over site security, and that at the very least there are triable issues of fact was to whether they exercised their retained control in a manner that affirmatively contributed to the attack in which he was injured. JSC and Cahill argue that the *Hooker* exception does not apply.

In *Sandoval*, our Supreme Court explained that to establish that a hirer owes a duty of care to a contractor's employee, the plaintiff must show that the hirer retained control over the contracted work and exercised that control in a manner that affirmatively contributed to the contract worker's injury. (*Sandoval, supra*, 12 Cal.5th at p. 274.)

---

[4] Degala contends that Cahill failed to meet its initial burden because it failed to show that its contract with Janus "actually" delegated site security to Janus. But under *Alvarez*, no such showing is required. (*Alvarez, supra*, 13 Cal.App.5th at p. 644.)

9

"A hirer 'retains control' where it retains a sufficient degree of authority over the manner of performance of the work entrusted to the contractor." (*Sandoval*, *supra*, 12 Cal.5th at p. 274.) "A hirer 'actually exercise[s]' its retained control over the contracted work when it involves itself in the contracted work 'such that the contractor is not entirely free to do the work in the contractor's own manner.' " (*Id.* at p. 276.) "Unlike 'retained control' which is satisfied where the hirer retains merely the *right* to become so involved, 'actual exercise' requires that the hirer in fact involve itself, such as through direction, participation, or induced reliance." (*Ibid.*)

A hirer's exercise of retained control is an "affirmative contribution" if it "contributes to the injury independently of the contractor's contribution (if any) to the injury." (*Sandoval*, *supra*, 12 5th at p. 277.) Neither " 'actual exercise' " nor " 'affirmative contribution' " requires that the hirer's alleged negligence must itself be an affirmative act. (*Ibid.*) Rather, "[t]he hirer's negligence may take the form of any act, course of conduct, or failure to take a reasonable precaution that is within the scope of its duty under *Hooker*." (*Ibid.*) Accordingly, a hirer may be liable for failing to undertake a promised safety measure. (*Ibid.*, citing *Hooker*, *supra*, 27 Cal.4th at p. 212, fn. 3.) "If a plaintiff proves that the hirer actually exercised retained control in a way that affirmatively contributed to the contract worker's injury, the plaintiff establishes that the hirer owed the contract worker a duty of reasonable care as to that exercise of control." (*Sandoval*, *supra*, 12 Cal.5th at p. 278.)

Whether JSC and Cahill owed a duty of care to Degala thus turns on whether JSC and Degala retained control over the performance of the demolition work that Janus was contracted to perform, and exercised that control in a way that contributed to Degala's injuries. To prevail on summary judgment, JSC and Cahill must demonstrate the absence of triable issues of

10

material fact as to the applicability of the retained control doctrine. (See *Brown v. Beach House Design & Development* (2022) 85 Cal.App.5th 516, 521, 529-534, petn. for review pending, petn. filed Dec. 23, 2022 [reversing summary judgment where there were triable issues of fact whether hirer undertook to supply scaffolding, delegated duty to provide and maintain scaffolding, and exercised control over scaffolding in a manner that contributed to plaintiff's injuries incurred in fall from unsafe scaffolding]; *Tverberg, supra*, 202 Cal.App.4th at pp. 1447-1448 [reversing summary judgment where hirer directed performance of contracted work in the vicinity of work outside the scope of the contract and defendant's employee concluded that sufficient safety measures were in place; jury could infer exercise of retained control constituting affirmative contribution to plaintiff's injury]; *Browne v. Turner Construction Co.* (2005) 127 Cal.App.4th 1334, 1345-1346 [reversing summary judgment where safety systems that defendants undertook to arrange were withdrawn before contractor's project was complete; evidence raised possibility that defendants "not only actively contributed to plaintiff's injuries, but actually *created* the situation in which they were likely to occur"].)

First we consider whether JSC and Cahill retained control over site security at the construction site. Degala has come forward with evidence from the written contracts: the contract between Cahill and Janus excluded site security from Janus's scope of work, and although the contract between JSC and Cahill delegated site security to Cahill, JSC retained the power to direct how the site security was set up. It was undisputed that in practice, JSC and Cahill jointly decided on the appropriate amount of site security, and that JSC purchased and installed a camera system for that purpose. All of this is evidence that JSC and Cahill retained control over site security.

11

Security measures taken at the site after the attack on Degala provide more evidence of retained control: JSC hired off-duty police officers to be stationed on site during work hours, and Cahill added a perimeter fence around the entirety of phase three of the project, eliminating the public walkway where Degala sustained his injuries. Although JSC and Cahill point out that under section 1151 of the Evidence Code, evidence of remedial measures taken after the incident is inadmissible to show negligence, the evidence is admissible and relevant here to show that JSC and Cahill had retained control over site security.[5]

We next consider whether Degala has come forward with evidence that JSC and Cahill retained control over Janus's contracted work and actually exercised that control. (*Sandoval, supra*, 12 Cal.5th at p. 276.) We conclude Degala has done so. Maintaining site security at Hunters Point East-West was an ongoing issue throughout the time of Janus's contracted demolition work. While Janus and Degala were performing their contracted work on site (which did not include site security), JSC and Cahill were having weekly discussions about site security because of ongoing concerns about the safety of property and people at the site, and implementing different measures to protect property and people in response to incidents in the neighborhood. From the elimination of overtime, the instructions to stop work before sundown and stay indoors for lunch and breaks, the occasional closures of the site, and the configurations of the fences around the site where Degala

---

[5] In support of its motion for summary judgment, JSC asserted in the trial court that responsibility for and control over site security was "shared" among JSC, Cahill, and Janus. But to the extent control over site security was shared with Janus, there was some retention of control by JSC and Cahill. In any event, there is no evidence that Janus had any authority to decide on or implement site security measures.

12

worked—from all of this a jury could infer that defendants' exercise of control over site security amounted to the exercise of control over the manner in which Janus performed its demolition work. (*Sandoval, supra*, 12 Cal.5th at p. 274.) A jury could infer that Janus was "not entirely free to perform the [contracted] work in the contractor's own manner." (*Id.* at p. 278.)

The next question is whether Degala came forward with evidence from which a jury could infer that JSC and Cahill's allegedly negligent exercise of their retained control affirmatively contributed to the harm he suffered. (*Sandoval, supra*, 12 Cal.5th at p. 283.) "[P]assively permitting an unsafe condition to occur rather than directing it to occur does not constitute affirmative contribution. [Citations.] The failure to institute specific safety measures is not actionable unless there is some evidence that the hirer . . . had agreed to implement these measures." (*Tverberg, supra*, 202 Cal.App.4th at p. 1446; see also *Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 46 [" '[a] hirer's failure to correct an unsafe condition' is insufficient" to establish liability under *Hooker*].) Here, Degala came forward with evidence that JSC and Cahill undertook the responsibility of taking reasonable precautions and providing reasonable protection to prevent injury to subcontractors' employees arising from unauthorized access to the Hunters Point East-West worksite, and evidence that Janus did not have obligations for site security. Degala's evidence included constructing (and taking down) fences at the job site, hiring security guards, installing a camera system, and evidence as to how these measures changed over time. This is not a case where JSC and Cahill passively permitted an unsafe condition to exist: there is ample evidence that JSC and Cahill took affirmative steps to address the dangers posed to workers in an area known to have a high rate of crime.

13

Degala argues that the evidence shows that the site security measures in place at the time he was attacked were not reasonable in the circumstances; that JSC and Cahill were negligent in configuring the fences, removing security guards, and failing to monitor the on-site cameras during the day; and that their negligence contributed to his injuries. He argues that by their actions JSC and Cahill left him with no safe means of completing his work, and observes that there is no evidence that Degala or Janus could have made alternative site security arrangements. JSC argues that Janus could have required its employees to work in pairs or groups; or required employees to close or secure the fences around the buildings after entering or leaving the walkway; or required employees to carry whistles or phones to call for help. This may be, but JSC does not cite to any evidence on the point.

Whether the measures taken by JSC and Cahill were reasonable, and whether or to what extent the alleged unreasonableness of those measures contributed to Degala's injuries are all questions of fact for a jury to resolve. On the record here, these issues cannot be resolved as a matter of law, and therefore it was error to grant summary judgment.

## DISPOSITION

The judgments are reversed and the matter is remanded to the trial court for further proceedings consistent with this opinion. Appellant shall recover his costs on appeal.

14

_____
Miller, J.

WE CONCUR:


_____
Stewart, P.J.


_____
Richman, J.

A163130, *Degala v. John Stewart Company, et al.*

15

Filed 2/7/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ABRAHAM DEGALA,<br><br>          Plaintiff and Appellant,<br><br>v.<br><br>JOHN STEWART COMPANY et al.,<br><br>          Defendants and Respondents. | A163130<br><br>(San Francisco County<br>Super. Ct. No. CGC18569661) |

      The opinion in the above-entitled matter filed on January 27, 2023, was not certified for publication in the Official Reports.  For good cause and pursuant to California Rules of Court, rule 8.1105, it now appears that the opinion should be published in the Official Reports, and it is so ordered.


Dated: _____          _____

                                            Stewart, P.J.

Court:  San Francisco County Superior Court

Trial Judge:  Hon. Ethan P. Schulman

Alan Charles Dell'Ario; Heinrich Law, Marjorie Heinrich, Ethan A. Wimert, for Plaintiff and Appellant

Tyson & Mendes, James E. Sell, Molly A. Gilardi, Shelley Kramer, Louis R. Barella, for Defendant and Respondent John Stewart Company

Hayes, Scott, Bonino, Ellingson, Guslani, Simonson & Clause, Mark G. Bonino, Andrea S. Nguyen, for Defendant and Respondent Cahill Contractors, Inc.

A163130, *Degala v. John Stewart Company et al.*