Filed 3/24/26  Brinkman v. Doe CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ERIN BRINKMAN, et al., <br><br>     Plaintiffs, Cross-Defendants, and Respondents, <br><br> v. <br><br> JANE DOE, <br><br>     Defendant, Cross-Complainant, and Appellant. | A173377 <br><br> (City & County of San Francisco Super. Ct. No. CGC-22-603026) |

Appellant Jane Doe was the lead plaintiff in a class action alleging discrimination against two banks.  She was represented by the attorneys who are the respondents here.  The attorneys negotiated separate settlements with each of the banks, and in the course of the second settlement a dispute arose as to the attorney fees to which the attorneys were entitled.  The attorneys filed an action for declaratory relief, and Doe filed a cross-complaint seeking similar relief and several other claims.  The parties filed competing motions for summary adjudication on their claims for declaratory relief, and the trial court ruled for the attorneys.  The attorneys then moved for summary judgment on Doe's remaining claims, on the basis that the summary adjudication meant that those claims could not succeed.  The trial court granted that motion too, and entered judgment for the attorneys.  We

1

affirm.

## BACKGROUND

### The General Setting

In March 2019, represented by Erin Brinkman, Doe filed in the United States District Court a class action lawsuit naming a bank as defendant (the federal action).  The federal action alleged that the bank, which came to be identified as Bank One,[1] unlawfully discriminated against Doe and the putative class by denying them the ability to open an account because of their United States citizenship status.  The complaint stated causes of action under the Unruh Act (Civ. Code, § 51 et seq.) and the Civil Rights Act of 1866 (42 U.S.C. § 1981), and sought statutory damages under the Unruh Act of $4,000 for Doe and the members of the putative California class, an award of attorney fees, and punitive damages.

In February 2020, Doe retained additional counsel to represent her along with Ms. Brinkman:  the firm of Lieff Cabraser Heimann & Bernstein LLP (Lieff Cabraser).  When referred to collectively, Ms. Brinkman and Lieff Cabraser will, for consistency with the briefing, will be called Attorneys.

When Lieff Cabraser became involved, Anne Shaver, an attorney at that firm, prepared a fee agreement and sent it to Ms. Brinkman for execution by Doe.  On February 14, Ms. Brinkman emailed the fee agreement to Doe requesting that she review the agreement and sign it.  Doe signed it and returned the signature pages that same day.  As pertinent here, the fee agreement included a detailed description of contingent fee provisions that varied depending upon developments in the litigation, providing as follows:

---

[1]     Because Doe elected to proceed below in a fictitious capacity though having sued the bank using her real name, to protect Doe's anonymity the defendant bank was referred to in the record below as Bank One.

"3.    **Contingent Legal Fee.**  CLIENT recognizes that she may recover as a result of a successful completion of this litigation and that any recovery will be the result of either an award by the court or a settlement. Should CLIENT recover money on CLIENT's claims, CLIENT will then be obligated to pay a contingent fee to ATTORNEYS.

"If the action is certified as a class action, and if a monetary recovery is obtained therein for the plaintiff class, either by settlement or judgment, ATTORNEYS retain the right to apply to the court for the greater of ATTORNEYS' 'lodestar' (defined as each Attorney's or legal professional's hourly rate times the number of hours each Attorney or legal professional worked on this matter) plus an enhancement of the lodestar that is available to be recovered under applicable law or a reasonable percentage of recovery basis out of such recovery, and/or from the defendants if allowed by statute and case law.

"If ATTORNEYS represent CLIENT on an individual basis only and ATTORNEYS obtain a monetary recovery for CLIENT on an individual basis, either by settlement or judgment, ATTORNEYS will be entitled to their costs related solely to the CLIENT's individual representation, plus compensation for their services related solely to CLIENT's individual representation in the amount of thirty-five percent (35%) of the total amount of the Gross Value of the settlement or award if obtained before trial begins or the amount forty percent (40%) if the case is resolved after trial commences or goes to judgment.  This limitation is not applicable if the attorneys' fee is negotiated separately or paid separately so as not to reduce the gross value of CLIENT's recovery.  'Gross Value' means the total of all monetary awards obtained whether by settlement, mediated result, arbitration award or court judgment including back and front pay, and damages, but excluding 'expenses.' "

3

The fee agreement also included an acknowledgment that Doe had read and understood its terms.[2]

Given the nature of the dispute here—between Attorneys and their client over attorney fees—we pause briefly from the chronology to note that this is not the typical setting in which the dispute arises, with an unsophisticated, inexperienced client/plaintiff with his or her attorney. Doe, by contrast, might accurately be called an atypical client and an atypical plaintiff—but quite a class representative. Doe is a litigation paralegal with extensive experience at a litigation law firm, apparently with particular experience in the area of attorney-client fee agreements and disputes, to the point that she serves as a lay arbitrator for the San Francisco Bar Association's Fee Dispute Arbitration Program. Moreover, Doe has been a plaintiff in at least 10 lawsuits in the past eight years, and entered into written attorney fee agreements in five of them, two of which were putative class actions that included claims for attorney fees under fee-shifting statutes. And as specifically applicable to the litigation here, Doe knew that the Unruh Act contained a fee-shifting provision, and that the complaint expressly sought attorney fees from defendant bank. As Doe would come to testify, fee-shifting statutes "are meant to encourage attorneys to take cases with otherwise low or nonexistent actual damages, and that would encourage

---

[2] It provided as follows: "12. **Acknowledgement.** The undersigned hereby acknowledge that they have read and understand the foregoing, that they have had the opportunity to consult with independent counsel, and that they agree to the representation on the terms set forth in this AGREEMENT. The undersigned all hereby acknowledge and agree that they have had the opportunity to provide input into the language of this AGREEMENT and that the terms of the AGREEMENT shall not be interpreted strictly against any single party to this AGREEMENT but shall instead be construed in a manner that most completely fulfills the intent of the parties as evidenced overall under the AGREEMENT's terms."

4

them to take cases . . . [¶] . . . which might give them an award of attorneys' fees and very little actual damages from which to take a bite of."

Before Lieff Cabraser entered the picture, Ms. Brinkman had defeated a motion to dismiss by Bank One. She then filed a motion for class certification, but when Lieff Cabraser joined in the representation, Attorneys withdrew the motion and sought to conduct discovery. Attorneys also filed a second amended complaint in the federal action, adding a second class representative and also an additional defendant, Bank Two. This complaint asserted the same claims in the original complaint and sought the same damages.

Significant discovery ensued, in the course of which Attorneys and their experts encountered various problems in ascertaining class members, presenting an obstacle to class certification, an obstacle of which Doe was aware, as she had discussed it with Attorneys as well as the attorneys for the banks. Despite the obstacle, Bank One attorneys were aware that some significant number of people had claimed to be "absent" class members. Apparently based on this information, Bank attorneys approached Attorneys regarding a possible settlement, indicating that Bank One was interested in settling the claims of the two named plaintiffs plus all other individuals with identical claims, and was willing to pay plaintiffs' attorney fees.

Attorneys consulted with Doe and her co-plaintiff and with their approval Attorneys negotiated a settlement with Bank One. This resulted in a Memorandum of Understanding (MOU) with Bank One, under which the Bank would settle the claims of 105 individuals, in connection with which it would pay a "total sum of $825,000 to Plaintiffs' counsel, to compensate the individual plaintiffs for their claims in the above-references lawsuit and to compensate Plaintiffs' counsel for their attorneys' fees." The MOU was dated

5

July 19, 2021.

Prior to signing the MOU, Attorneys discussed allocation of the total amount with Doe and her co-plaintiff, proposing the following:

- Doe would receive $17,5000, and her co-plaintiff $7,500, in light of their respective roles as original and added class representatives, their service to the class, and the support Doe had provided to putative class members;
- claimants in California would receive between $3,000 and $3,500 and claimants outside California between $1,000 and $1,500, with final amounts to be determined based on the number of participating claimants; and
- the remainder would go to attorney fees.

Ms. Brinkman discussed the terms with Doe and, as Ms. Brinkman put it, "[Doe] is on board." And Ms. Brinkman would come to testify, "we had numerous conversations about what [Doe] was going to be receiving . . . . There was never, ever, ever any discussion with her about receiving a contingency fee from our recovery, never, not once."

On July 19, Ms. Brinkman informed Ms. Shaver of Doe's agreement, and Attorneys executed the MOU the same day. Doe was sent a copy.

Attorneys then reached out to each person who had contacted them as a potential claimant, in connection with which Doe assisted attorneys in their attempts. Attorneys informed Bank One that 85 claimants would participate in the settlement (rather than 105), and the parties agreed to reduce the total value by $3,000 per claimant. The amount apportioned for attorney fees remained the same.

On October 27, Doe signed the settlement agreement. Consistent with the MOU, the settlement agreement states that the total amount paid

6

"constitutes the entire amount due to Plaintiffs, the 85 additional individual claimants represented by Plaintiffs' Counsel (identified by name on Exhibit A), *and Plaintiffs' Counsel, . . .* inclusive." (Italics added.) Doe received a check for $17,500 and cashed it.

While Doe did cash the check, apparently without question, Doe's brief here alludes to the fact that she claimed to have some concerns. As her brief describes, "Doe did receive and deposited her check from the settlement with Bank One in November 2021. Although the dispute between Doe and Attorneys did not arise until the events surrounding the [second] settlement with Bank Two, Doe's misapprehension about the representation is clear from an email she sent Brinkman at the time the settlement agreement with Bank One was provided to her, wherein she stated, 'By the way, Erin, what was the document governing distribution of the settlement funds? I didn't see the $[amount Doe received] representative service award mentioned anywhere.'"

Whether such "misapprehension" was real and, if it was, the cause of it is not further explained in Doe's brief. But we note here that, as Attorneys would later come to learn, they were not the only attorneys Doe had been in contact with in the course of the litigation. As Doe admitted, she had been in contact with, if not represented by, one Alfred Rava, contact that Doe would later describe included "with regard to the fees." Indeed, Doe acknowledged that she "remained in contact with Mr. Rava throughout the underlying litigation and did discuss issues with him such as the fees Attorneys were taking in the case."[3]

---

[3] Doe would assert the attorney-client privilege over her communications with Mr. Rava.

In March 2022, Doe asked Ms. Shaver to review the allocation of the settlement with Bank One, which Attorneys did. Doe also asked Attorneys to represent her in connection with other cases, which they declined.

Meanwhile, in the federal action Bank Two made a motion to dismiss, which was granted by the District Court. Attorneys appealed, and the Ninth Circuit reversed. Bank Two filed another motion to dismiss, this time unsuccessfully, as Attorneys defeated it. At that point Attorneys and Doe discussed whether to approach Bank Two regarding settlement. As memorialized in an email from Ms. Shaver to Ms. Brinkman and Doe, Ms. Shaver and Doe had a telephone conversation in which they discussed that the goal for settlement was a stipulated "Rule 23(b)(2) class for injunctive relief *plus a fund to cover attorneys' fees* and a service award (both of which are given at the discretion of the Court, of course, but there would be a fund to pay them if the Court grants them)." (Italics added.)

Bank Two was receptive to the idea of settlement, and the parties agreed to mediation with Judge Edward Infante (Ret.) of JAMS. The mediation occurred on September 22, 2022, and was successful, resulting in a settlement with Bank Two for $550,000.[4] As Doe would come to admit, at the mediation she agreed to a division of the settlement proceeds between herself, her co-plaintiffs, and fees for Attorneys.

On October 6, Attorneys sent the settlement agreement to Doe by email

---

[4] The settlement consisted of a lump sum payments, described this way: "The Settlement Payment constitutes the entire amount due to Plaintiffs, the 85 additional individual claimants represented by Plaintiffs' Counsel (identified by name on Exhibit A), and Plaintiffs' Counsel, inclusive, in full and final resolution of the Action and all claims that were or could have been asserted therein against Simple. Plaintiffs' Counsel shall be solely responsible for the allocation of the proceeds from the Settlement Payment to Plaintiffs and each of the additional 85 individual claimants."

8

to review and sign. The email states: "Our agreement is that of the $550,000 settlement payment, you will receive $20,000, [co-plaintiff] will receive $10,000, and the remainder will reimburse counsel for attorneys' fees and expenses."

Doe's brief asserts that at that point "it became clear to her that she had been misled." And the brief adds, "the hostile conversation from the previous week with Brinkman, informing Attorneys that she would be pursuing outside advice, and asking for a[n] itemization of the fees and costs Attorneys were claiming, as well as 'a copy of the fee agreement, if any, between us.'" And Doe stated that all further communications between them should be in writing.

On October 7, Attorneys emailed Doe a copy of the fee agreement, along with Attorneys' time and expense records. Doe wrote back, claiming that the entire settlement was her individual recovery and under the terms of the fee agreement she was entitled to 65% of the total settlement amount, Attorneys only 35%.

On October 7, Ms. Shaver responded in an email that included this:

"The relevant part of the provision is as follows:

"'This limitation is not applicable if the attorneys' fee is negotiated separately or paid separately so as not to reduce the gross value of CLIENT's recovery.'

"We entered into the negotiation and continued the entire day with a detailed discussion of how any settlement we agreed to would be apportioned between you, the clients, and us, the lawyers.

"The attorneys fee versus client recovery was negotiated separately from the very start of the mediation. As you will recall, throughout the day, each time we responded to [Bank Two] with a counter-offer, it was with your

9

express agreement as to how much of that counteroffer would go to you if it was accepted. Erin, Tiseme, you, and I were present for that. At the conclusion of the mediation, you agreed to a client recovery of $20,000, and Vitalii agreed to a client recovery of $10,000. We have been 100% up front and transparent with you about the apportionment from start to finish.

"I remain willing to talk about any of this at your convenience."

The parties exchanged emails back and forth between October 7 and 13, in the course of which Doe made accusations of theft, fraud, deceit, and malpractice and threatened to sue Attorneys unless they paid her 65% of both settlements. Also during this period, Attorneys threatened to withdraw from representing Doe, and advised that she was disputing the amount Attorneys claimed they were entitled to and that any "oral agreement[s]" between them were void.

On October 10, Doe signed the settlement agreement and cashed her check for $20,000, nevertheless maintaining her position that under the fee agreement she was entitled to 65% of the total settlement.

**The Proceedings Below**

On November 18, 2022, Attorneys filed a complaint for declaratory relief, seeking a determination that Attorneys were entitled to the fees collected in both settlements under the terms of the fee agreement.

On January 25, 2023, represented by attorney David Hiller, Doe filed a cross-complaint naming Attorneys and Ms. Shaver. The cross-complaint sought declaratory relief and eight other causes of action, for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, fraud, embezzlement, theft by deceit, conversion, and violation of Business and Professions Code section 17200.

In June 2024, apparently based on a stipulation, Attorneys and Doe each filed motions for summary adjudication on their respective causes of

10

action for declaratory relief. Attorneys argued that the fee agreement was straightforward and permitted separate negotiation of fees to be paid by the defendants rather than as a contingency fee of Doe's recovery. Doe argued that her agreements with Attorneys in connection with the settlements constituted oral modifications of the fee agreement, and were thus in violation of Business and Professions Code section 6147 (section 6147). Doe's opposition to Attorneys' motion included objections based on mediation confidentiality to some evidence in declarations supporting Attorneys' motion.

The motions were heard by a most experienced trial judge, the Honorable Richard Ulmer, who denied Doe's motion and granted Attorneys'. In the order granting the Attorneys' motion, Judge Ulmer held: "[Attorneys] correctly interpret the parties' fee agreement . . . . [¶] . . . [¶] The fee agreement thus allows the parties to negotiate attorney's fees separate from the 35% contingency fee rate. That is precisely what the parties did in this case and the scheme is consistent with *Flannery v. Prentice* (2001) 26 Cal.4th 572, 575. There, the court held that statutorily awarded fees belong to the laboring attorney absent a contractual agreement to the contrary. In this case, the banks' settlements were intended to cover [Doe's] recovery as well as [Attorneys'] fees under the Unruh Act's fee-shifting provision. The court rejects [Doe's] attempt to obtain a windfall from counsel's work.

"[Doe's] reliance on Business & Professions Code section 6147 and *Stroud v. Tunzi* (2008) 160 Cal.App.4th 377 is misplaced. In *Stroud*, it was clear that the attorney was modifying the fee agreement from a $75,000 flat fee to a 50% contingency agreement. In this case, there was no such modification of the agreement. Rather, the parties merely implemented the terms of the fee agreement when they had their negotiations." (Italics

11

added.)

Judge Ulmer did not rely on any of the evidence that Doe objected to based on mediation confidentiality, but rather declined to rule on the objections "since the adduced evidence is unnecessary to dispose of the motion."

Attorneys then filed a motion for summary judgment on Doe's remaining causes of action. Attorneys argued that Doe's remaining causes of action were predicated on Doe prevailing on her interpretation of the fee agreement, that is, on Doe successfully showing that the 35% contingency fee provision applied. Since that provision did not apply, none of her other causes of action had merit.

Judge Ulmer agreed, holding as follows: "In its order of November 12, 2024, the court concluded that the parties negotiated a separate fee and the 35% contingency fee did not apply. The record in this motion confirms that conclusion. Cross-complainant Doe's claims, which are predicated on the enforceability of the contingency fee agreement, therefore fail."

Judgment was entered for the Attorneys, from which Doe filed a notice of appeal.

## DISCUSSION

### Judge Ulmer Was Correct: There Was No Modification of the Fee Agreement

Doe makes three arguments on appeal, the first and most fundamental of which—consuming 75% of Doe's argument—is set forth in the index as follows: "I. The Oral Agreements Were Modifications of the Contingency Fee Agreement and Were Subject to Section 6147." Doe's brief elaborates on the argument this way: "the court erred in its ruling that the oral agreements alleged by Attorneys were *not* modifications of the Fee Agreement and thus not subject to Section 6147. The alleged agreements modified the most

12

essential term of the Fee Agreement, specifically the fees themselves. Permitting oral negotiations like this where a contingency fee agreement contains a statement that the fee may be 'separately negotiated' undermines the entire statutory scheme created by Section 6147."[5]

The argument begins with reference to the claimed reasons of section 6147, and then devotes several pages discussing "case law applying" it, included among which is a lengthy discussion of *Stroud v. Tunzi* (2008) 160 Cal.App.4th 377 (*Stroud*), a case heavily relied on by Doe below and mentioned in several places in Doe's brief here. Then, after discussing two other cases, Doe asserts that the so-called "oral agreements were unenforceable modifications of the Fee Agreement," from there asserts that Judge Ulmer "mischaracterize[d]" the fee agreement in *Stroud*, and then spends several pages discussing "modification of the agreement." Whatever its length, the argument has no merit.

To begin with, the argument ignores the facts here, as Judge Ulmer concluded: there were no "modifications" of the fee agreement. As quoted, the fee agreement states that the 35% contingency fee provision "is not applicable if the attorneys' fee is negotiated separately or paid separately so as not to reduce the gross value of CLIENT's recovery." This is exactly what occurred here, as in both settlements Doe and Attorneys agreed as to what

---

[5] Business and Professions Code section 6147 is entitled, "Contingency fee contracts" and provides in part in subdivision (a): "An attorney who contracts to represent a client on a contingency fee basis shall, at the time the contract is entered into, provide a duplicate copy of the contract, signed by both the attorney and the client, . . . to the plaintiff . . . . The contract shall be in writing and shall include, but is not limited to, all of the following: [¶] [listing the necessary contents]." (Bus. & Prof. Code, § 6147, subd. (a)(1)–(5).) "Failure to comply with any provision of this section renders the agreement voidable at the option of the plaintiff, and the attorney shall thereupon be entitled to collect a reasonable fee." (*Id.*, § 6147, subd. (b).)

Doe's recovery would be and what the attorney fees would be, just as contemplated by the fee agreement. As Judge Ulmer aptly put it, "the parties merely implemented the terms of the fee agreement."

The undisputed facts showed that Doe knew from the outset that the plan was for Attorneys to be paid directly by the banks, not as a contingent portion of the recovery, as the fee agreement expressly provided. Doe knew that the Unruh Act contained a fee-shifting provision, knew the purpose of fee-shifting was to encourage attorneys to take low value claims, and knew her complaint against the banks included a claim for attorney fees. In short, Doe, a person most experienced in attorney fee issues, agreed that Attorneys seek fees from the banks, agreed to the amounts she and Attorneys would receive, and signed both settlements expressly providing that the settlement amounts included money due to Attorneys.

All this was manifestly proper, as expert testimony presented to Judge Ulmer confirmed. That testimony was from Jocelyn Larkin, the former executive director of the Impact Fund, with expertise in complex litigation and civil procedure, class action practice, attorney fees, ethics, and legal writing.[6] Ms. Larkin testified that in civil rights cases "retainer agreements frequently include provisions that permit attorneys to be compensated either as a percentage of the client's individual recovery or directly from defendants pursuant to a fee-shifting statute." As she further explained, "the claims have relatively low monetary value," and "it is not economically feasible for a lawyer to agree to work on a solely contingent fee basis for a client whose claim has minimal economic damages." So, attorneys make allowances in

---

[6] Ms. Larkin also taught attorney fees law to civil rights and legal aid practitioners for 20 years and has authored amicus briefs on attorney fee cases in state and federal courts.

14

their agreements that attorney fees may be paid directly by defendants rather than as a contingency percentage of the client's recovery, as here: "Paragraph 3, which sets the terms of attorney compensation, includes this common provision with fees paid directly by the defendants pursuant to a fee-shifting statute or as a percentage of the client's individual recovery."

In one of her several references to *Stroud*, Doe's brief asserts that Judge Ulmer erred by mischaracterizing the fee agreement there. Doe is wrong. In *Stroud*, the original fee agreement provided that client would pay attorneys a flat fee of $75,000 if the lawsuit settled before trial and 40% of any recovery thereafter. The matter settled before trial, and attorneys attempted to enforce an oral agreement that client would pay 50% of the settlement amount. While Judge Ulmer may have used shorthand to describe the attorneys in *Stroud* as "modifying the fee agreement from a $75,000 flat fee to a 50% contingency agreement," the fact is as Judge Ulmer said clearly in his order: "[i]n *Stroud* it was clear that the attorney was modifying the fee agreement . . . . In this case, there was no such modification of the fee agreement."

Doe cites two other cases in support of this argument: *Arnall v. Superior Court* (2010) 190 Cal.App.4th 360 (*Arnall*) and *Missakian v. Amusement Industry, Inc.* (2021) 69 Cal.App.5th 630 (*Missakian*). Neither avails her. *Arnall* merely held that the written fee agreement was unenforceable for failure to comply with section 6147's requirement to include a statement that the fee was not set by law but was negotiable. (*Arnall, supra*, 190 Cal.App.4th at pp. 369–371.) And *Missakian* dealt with the situation in which a verbal attorney agreement was never reduced to a writing in compliance with section 6147, and thus a failure to create an enforceable agreement to begin with. (*Missakian, supra*, 69 Cal.App.5th at

15

pp. 638, 643–653.)

The result Doe seeks, treating the full settlement amounts as her individual recovery, disregards not just the fee agreement but also the reality of the facts here, as Doe herself acknowledged. For example, Doe personally drafted an initial motion for class certification asserting that damages were uniform across the proposed class—the statutory amount of $4,000 per class member. She also corresponded with numerous putative class members and advised them that their claims " 'may entitle you to an award of attorney's fees and statutory damages in the sum of $4,000.' "

Within her argument Doe has a boldfaced heading that *Flannery v. Prentice* (2001) 26 Cal.4th 572 (*Flannery*) "Is Inapposite to This Case," in the course of which Doe asserts that *Flannery* was "the centerpiece" of Attorneys' legal position and Judge Ulmer's ruling on summary adjudication. To the contrary, the centerpiece was the fee agreement itself, and *Flannery* cited to make the point that the fee agreement's provisions are consistent with the law: fees belong to attorneys and not the client.

In *Flannery* attorneys brought a successful claim for employment discrimination under FEHA, which included a claim for attorney fees pursuant to FEHA's fee-shifting provision. The jury awarded the client $250,000 in damages for her employment discrimination claim, and the trial court awarded attorneys $1,088,231 in fees. (*Flannery*, *supra*, 26 Cal.4th at p. 576.) The client then claimed that she was entitled to the entire fee award and that, pursuant to a verbal agreement with counsel, attorneys were only entitled to 40% of the jury verdict. (*Ibid*.) The Supreme Court held that absent an enforceable contractual agreement as the statutory attorney fees, such fees belong to the attorneys who earned them, not the client. (*Id*. at p. 577.) The court emphasized the important public policy reasons behind its

16

ruling, most significantly that to hold otherwise would eviscerate the aim of fee-shifting statutes in incentivizing counsel to "undertake cases that vindicate fundamental public policies" such as antidiscrimination. (*Id.* at p. 583.) This is why Judge Ulmer concluded that the "[F]ee [A]greement thus allows the parties to negotiate attorney's fees separate from the 35% contingency fee rate. That is precisely what the parties did in this case and the scheme is consistent with *Flannery . . . .*" (Italics added.)

As noted, the federal action was brought under the Unruh Act, and courts have held that the rationale of *Flannery* applies to attorneys' rights to statutory fees under that Act as well. (See, e.g., *Ruiz v. California State Auto. Assn. Inter-Insurance Bureau* (2013) 222 Cal.App.4th 596, 607.) The settlement agreements explicitly state that the amounts paid are "due to Plaintiffs and Plaintiffs' Counsel." These attorney fees indisputably "belong to the attorneys who labored to earn them." (*Pulliam v. HNL Automotive Inc.* (2022) 13 Cal.5th 127, 138 [holding that attorney fees are not part of a consumer's recovery because they belong not to the consumer but to the attorney and citing the Unruh Act as an example of a consumer protection statute with a fee-shifting provision].) And Judge Ulmer properly "reject[ed] [Doe's] attempt to obtain a windfall from counsel's work."

Doe also asserts that *Flannery* is inapposite because it involved fees awarded by a court rather than as part of a settlement. This is irrelevant. As Ms. Larkin testified, pursuant to a fee-shifting statute, and absent a contractual provision to the contrary, the fees belong to the attorney and not to the client. It does not matter whether the fees are recovered by judgment or by settlement. (See *Tipton-Whittingham v. City of Los Angeles* (2004) 34 Cal.4th 604, 610 [FEHA's fee-shifting does not require that the prevailing party obtain a court judgment, and upholding award of attorney fees under

17

catalyst theory where matter was resolved by way of defendant's voluntary practice changes].)

Finally, the outcome that Doe seeks here is contrary not just to the principles espoused in *Flannery,* but also to the applicable professional rules. California Rules of Professional Conduct Rule 5.4 states that "a lawyer or law firm shall not share legal fees directly or indirectly with a nonlawyer." As Ms. Larkin testified, allowing clients to take a share of attorney fees obtained by way of settlement or judgment would potentially be splitting fees with a non-lawyer, in contravention of this rule. Doe's demand seeks exactly that.

Doe's final boldfaced sub-argument is that "**E.  Public Policy Concerns Support Strict Enforcement of Section 6147**." There is no doubt there is a public policy supporting enforcement of section 6147 so that there is a clear understanding by a client of the contingent fee. At the same time there is a strong public policy favoring attorney fee provisions such as that here, in cases where, as Ms. Larkin put it, "the claims have relatively low monetary value," and "it is not economically feasible for a lawyer to agree to work on a solely contingent fee basis for a client whose claim has minimal economic damages." That latter policy applies here, especially as there was no violation of section 6147.

**There Was No Evidentiary Error**

Doe's second argument asserts that "II. The Court Erred in Admitting Evidence of the Oral Agreement at Mediation In Violation of Evidence Code Section 1119." But the argument begins with the assertion that the ground "for reversal is the lower court's failure to rule on and sustain Doe's objections to Attorneys' evidence concerning the second 'separately negotiated' agreement, which allegedly occurred at the mediation with Bank Two in September 2022. Because the alleged separate negotiations and agreement occurred entirely in the context of mediation, their introduction

18

into evidence is clearly barred by the provisions of California's broad mediation privilege, codified in Evidence Code Section 1119 . . . ." Judge Ulmer did not err.

By way of brief recap, both parties submitted evidence of communications made during the mediation. For Attorneys, such evidence came from the declarations of Attorneys and the attorneys for Bank Two. For Doe, such evidence was the text messages between Attorneys that took place during the mediation. But Judge Ulmer did not, as the argument states, "admit" evidence of communications made during the mediation. To the contrary, he declined to rule on Doe's objections to those communications because it was unnecessary: "The court does not rule on the parties' evidentiary objections since the adduced evidence is unnecessary to dispose of the motion."

Doe argues that this ruling is illogical because Judge Ulmer could not have concluded that there were negotiations pertaining to the second settlement without relying on statements made during the mediation. But that is not true, as the record included statements made after the mediation had ended, and thus not within the prohibition of Evidence Code section 1119, subdivision (c), which makes confidential: " '[a]ll communications, negotiations, or settlement discussions by and between participants in the course of a mediation . . . .' " (See *Simmons v. Ghaderi* (2008) 44 Cal.4th 570, 578 ["Section 1119 governs the general admissibility of oral and written communications made during the mediation process"].)

There was evidence of the parties' positions from after the mediation, including the October 6, 2022 email from Attorneys to Doe stating, "Our agreement is . . ." and setting forth the specific apportionment; the October 7 email from Attorneys to Doe again stating the agreement; and Doe's email of

19

October 10 confirming her signature to the settlement agreement. All three of these occurred more than ten days after the September 22, 2022 mediation concluded and communication with the mediator ceased, i.e., after the mediation had ended. (Evid. Code, § 1125.) And Doe did not object to any of these three communications on the basis of mediation confidentiality.

Doe asserts that Judge Ulmer relied on mediation evidence because his November 12, 2024 order "cites Attorney's UMF's [undisputed material facts] concerning the mediation." Again, Doe is wrong. The order cites UMFs 3, 8, 24, 26, and 46. UMFs 3, 8, 24, and 26 do not pertain to the second settlement with Bank Two, and therefore involve no mediation evidence. And UMF 46 states a provision from the settlement agreement with Bank Two—which agreement was created after the mediation—from the executed version Doe sent on October 10, 2022. So, mediation confidentiality could not apply to it. And again, Doe did not make a mediation confidentiality objection to any of these UMFs.

### Judge Ulmer Correctly Held There Were No Triable Issues of Material Fact on Doe's Other Causes of Action

As noted, after Judge Ulmer granted Attorneys' motion for summary adjudication on their declaratory relief cause of action, Attorneys moved for summary judgment on Doe's remaining causes of action. Judge Ulmer granted it, holding as follows:

"In its order of November 12, 2024, the court concluded that the parties negotiated a separate fee and the 35% contingency fee did not apply. The record in this motion confirms that conclusion. Cross-complainant Doe's claims, which are predicated on the enforceability of the contingency fee agreement, therefore fail. The evidence shows that attorney Brinkman discussed Doe's recovery from Bank One with Doe, Doe received a copy of the MOU, Doe signed the settlement agreement and Doe cashed her settlement

20

check.  The evidence also shows that Doe was aware of the Bank Two settlement, the funds she was to receive and she consented to the settlement. The above undisputed facts are dispositive and cross-defendants are entitled to summary judgment on the cross-complaint."

Doe's final argument, a brief two pages, contends this was error.  The contention is easily rejected.

"On appeal '[w]e review a grant of summary judgment de novo; we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law.  [Citations.]' (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.)  Put another way, we exercise our independent judgment, and decide whether undisputed facts have been established that negate plaintiff's claims.  (*Romano v. Rockwell Internat., Inc.* [(1996)] 14 Cal.4th [479,] 487.)  As we put it in *Fisherman's Wharf Bay Cruise Corp. v. Superior Court* (2003) 114 Cal.App.4th 309, 320: '[W]e exercise an independent review to determine if the defendant moving for summary judgment met its burden of establishing a complete defense or of negating each of the plaintiff's theories and establishing that the action was without merit.' (Accord, *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972.)

" '. . . [W]e accept as true the facts . . . in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them.' [Citation.]  And we must ' "view the evidence in the light most favorable to plaintiff[] as the losing part[y]" and "liberally construe plaintiff['s] evidentiary submissions and strictly scrutinize defendant['s] own evidence, in order to resolve any evidentiary doubts or ambiguities in plaintiff['s] favor." ' (*McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 96–97.)" (*Nazir v. United Airlines Inc.* (2009) 178

21

Cal.App.4th 243, 253–254.)

In addition to the above is the well-recognized admonition, set forth, for example, in *Claudio v. Regents of University of California* (2005) 134 Cal.App.4th 224, 230 this way: "On review of a summary judgment, the appellant has the burden of showing error, even if he did not bear the burden in the trial court. [Citation.] . . . '[D]e novo review does not obligate us to cull the record for the benefit of the appellant in order to attempt to uncover the requisite triable issues. As with an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate error and, therefore, to point out the triable issues the appellant claims are present by citation to the record and any supporting authority. In other words, review is limited to issues which have been adequately raised and briefed.' "

Doe asserts, however conclusorily, that triable issues of material fact exist as to "whether Doe and Attorneys did in fact 'separately negotiate' those fees"; and "[s]imilarly, triable issues remain regarding the second settlement with Bank Two. Evidence from Attorneys' own communications present a triable issue whether they manipulated Doe in the process and explicitly employed strategies against her to coerce her consent."

Doe's conclusory arguments do not meet the demonstration required by *Claudio*, which is perhaps not surprising, as Judge Ulmer got it right. The facts he relied on were "undisputed and dispositive," and Doe demonstrates nothing to the contrary—and thus fails to demonstrate any genuine issue of material fact. As to the Bank One settlement, the undisputed evidence shows Ms. Brinkman discussed Doe's recovery with her, Doe received the MOU, Doe executed the settlement, and she deposited the settlement proceeds. As to the Bank Two settlement, Doe admitted she was aware of the settlement and of the amounts allocated to her, and that she consented to the settlement.

22

Once Judge Ulmer rejected Doe's fundamental claim, her remaining tort and contract claims could not survive.  Put slightly differently, whatever Doe's claimed issues of fact, they were not material.

## DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.

_____

                    RICHMAN, ACTING P. J.

We concur.

_____

MILLER, J.

_____

DESAUTELS, J.

(A173377N)